WERNER LEHARA INTERNATIONAL, INC., a Michigan Corporation, Plaintiff,

v.

HARRIS TRUST & SAVINGS BANK, a Foreign Corporation, Defendant.

No. G79–684 CA1.

United States District Court, W. D. Michigan, S. D.

Jan. 2, 1980.

---

7. *See* note 3, *supra*.

Richard A. Kay, Grand Rapids, Mich., for plaintiff.

John D. Tully, Grand Rapids, Mich., for defendant.

## OPINION AND ORDER

HILLMAN, District Judge.

Plaintiff Werner Lehara International, Inc. ("Werner") moves for a preliminary injunction pursuant to Rule 65(a) Fed.R. Civ.P., enjoining defendant Harris Trust & Savings Bank ("Harris") from making payments under its December 3, 1975 Letter of Credit No. SP 21571 to the Bank Melli, Tehran, Iran.

On November 28, 1979, the day suit was filed, plaintiff requested this court to issue a temporary restraining order. Following a telephone call to the defendant and to its Chicago counsel, the court signed the TRO and immediately set a hearing to be held within ten days. That hearing date was subsequently adjourned by agreement of counsel to Monday, December 17, 1979, at which time the court held an evidentiary hearing including oral argument. The following facts appear from the evidence presented:

The problems faced by plaintiff arise from the recent cataclysmic revolution and turmoil in Iran, which in turn, have raised serious uncertainties about the enforceability of plaintiff's contract with the ousted Imperial Government of Iran, and upon banking arrangements incident to plaintiff's contract.

Werner, located in Grand Rapids, Michigan, manufactures bakery equipment for international trade. On September 4, 1975, Werner entered into a contract with the Foreign Transactions Company of Tehran, Iran, in which Werner agreed to provide certain machinery and equipment and consulting services for a particular Imperial Government of Iran bakery project in Bandar Abbas, Iran. In exchange, Werner was to receive payment of $1,560,685.00, payable in U. S. dollars. By correspondence dated December 15, 1976, Werner was notified that the State Organization for Grain, Sugar & Tea ("State Cereal Organization") was substituted for the Foreign Transaction Company as party to the contract.

The contract provides for payment to Werner as follows:

(a) An advance payment of twenty per cent, amounting to $312,137.00, of the total value of machinery and equipment supplied by Werner under the contract, upon Werner's submission of operation charts and maps and further upon Werner's opening of a Letter of Credit in the amount of $312,-137.00 as a reciprocal advance payment guarantee to the State Cereal Organization.

(b) Payment of sixty per cent, amounting to $936,411.00, upon receipt by the State Cereal Organization of shipping documents for the machinery and equipment supplied by Werner.

(c) Final payment of twenty per cent, amounting to $312,137.00, after Werner's installation of the machinery and equipment at the plant site in Bandar Abbas, Iran, and upon execution by the State Cereal Organization of a Preliminary Acceptance.

Payments to Werner under the contract were to be paid by means of a Letter of Credit supplied by the State Cereal Organization through the Bank Markazi, Iran, in the amount of $1,560,685.00. Also, by virtue of the terms of the contract, Werner was required to furnish two separate Letters of Credit for the benefit of the State Cereal Organization:

(a) An advance payment guarantee in the amount of twenty per cent of the contract price for the machinery and equipment supplied by Werner in order to secure the State Cereal Organization in making the twenty per cent advance payment to Werner. The contract further provides that Werner could release this Letter of Credit upon submission of its shipping documents for the machinery and equipment supplied under the contract.

(b) A good performance guarantee in the amount of $156,095.00 being ten per cent of the contract price for the machinery and equipment (the Harris Letter of Credit [1] now in dispute) collectible by the State Cereal Organization "without condition" and without resort to legal proceedings in the event that Werner failed to comply with its commitments on the machinery. The duration of the guarantee is specified as "twelve months extendable to another twelve months". In addition, the contract provides for the reduction of the Harris Letter of Credit by fifty per cent upon the preliminary acceptance by the State Cereal Organization of the machinery and equipment, with the balance of the Harris Letter of Credit to be released one year after the preliminary acceptance. Also, Werner has guaranteed performance, service and opera-

1. The Harris Letter of Credit reads as follows:
"HARRIS
BANK          LETTER OF CREDIT NUMBER
                      SP 21571

111 West Monroe Street
Chicago, Illinois 60690

Cable Address: HARRISBANK
Telex: 25-3417          December 3, 1975

The Bank Melli
Central Branch—Ferdowsi Avenue
Tehran, Iran
Gentlemen:
We hereby open our irrevocable letter of credit number SP 21571 in your favor for the account of Werner Le Hara International, Inc., Grand Rapids, Michigan, for up to U. S. $156,095.00 available by your draft at sight on us, accompanied by the following documents:
This is a clean letter of credit and no documents are required.
The draft drawn under this letter of credit must be marked "Drawn under Harris Trust & Savings Bank Credit No. SP 21571" and all communications with respect to this letter of credit should include the number hereof and should be addressed to our International Department. We hereby agree with the drawer, endorsers and bona fide holders of any draft drawn under and in compliance with the terms of this letter of credit that the same shall be duly honored on or before November 6, 1976, provided, however, that such date shall be extended until November 6, 1977, upon receipt by us of written notice by you received on or prior to October 6, 1976, requesting such extenstion (sic). Drawings by tested telex are permitted provided that they are received at our offices in Chicago, Illinois, before the close of business on November 6, 1976, or if extended as provided for above by the close of business on November 6, 1977.
Except as far as otherwise expressly stated, this documentary credit is subject to the Uniform Customs and Practice for Documentary Credits (1974 Revision) International Chamber of Commerce Publication 290.
          Harris Trust and Savings Bank
          By /s/ _____
               Authorized Signature"

tion of all machinery and equipment supplied under the contract for a period of twelve months following the date of preliminary acceptance and, in default of this guarantee, the State Cereal Organization has the right to draw on the Harris Letter of Credit.

The completion date for the project was initially set at ten months following the designation of the construction site by the State Cereal Organization. The contract further provides that if Werner fails to complete its obligations under the contract within the specified time, Werner must indemnify the State Cereal Organization at the rate of five per cent per day of the total value of the delayed work. Also if the delay exceeds one month, the State Cereal Organization has the right to cancel the contract and to "confiscate" the Harris Letter of Credit without the necessity of legal proceedings. The final payment of twenty per cent to Werner under the contract is to be made upon the preliminary acceptance of the machinery and equipment which is upon the determination by the State Cereal Organization that the factory is operational, has had one month of satisfactory testing and is ready for commercial exploitation. The State Cereal Organization is required to designate a "transfer team" to inspect the site, after which certification of preliminary acceptance is to be issued.

In order to comply with the terms of the contract, specifically arranging for a Letter of Credit, Werner consulted the Union Bank and Trust Company, its local bank in Grand Rapids. The Union Bank apparently had no expertise in the field of international banking and, consequently, contacted its correspondent bank in Chicago, Harris. As a result of that contact, on December 3, 1975, Harris opened an irrevocable letter of credit in favor of the Bank Melli for the account of Werner of Grand Rapids in the amount of $156,095.00. The Letter of Credit stated that it was "a clean letter of credit and no documents are required." In the meantime, Foreign Transactions Company, in accordance with the contract, had obtained an irrevocable Letter of Credit through the Bank Markazi in Iran to be handled and supervised by the Detroit Bank & Trust Company in Detroit, Michigan. This presumably was plaintiff's guarantee of getting paid once the contract had been fully performed. The evidence further indicates that the plaintiff at least looked on these Letters of Credit as being mutual and that it was willing to extend its Letter of Credit through Harris guaranteeing its performance, as long as the Letter of Credit at the Detroit Bank & Trust Company continued to be in existence. Neither of these Letters of Credit could be amended without approval of both parties to the document. However, each had a validity or termination date which when it arrived, unless extended, terminated all obligations thereunder.

Although the contract was originally to be performed in a year, innumerable delays and complications developed. The Foreign Transactions Company was slow in opening its Letter of Credit and payment was consistently late. In addition, problems at the site developed when the building contractor failed to meet the construction timetable. As a result, the State Cereal Organization extended the contract terms several times and also delayed its preliminary acceptance of the machinery and equipment supplied by Werner. After prolonged negotiation, officers of Werner met on June 9 and 10, 1978, with a representative of the State Cereal Organization in Dusseldorf, Germany, and executed an understanding known as "Process-Verbal". This document acknowledged the operational status of the machinery and equipment supplied by Werner and contemplated the State Cereal Organization's preliminary acceptance of the machinery and equipment, the payment of the remaining twenty per cent contract amount to Werner and the reduction of the good performance guarantee (the Harris Letter of Credit) within a reasonably short period of time. According to evidence submitted by Werner, it performed its obligations under the "Process-Verbal" by sending technicians to the plant site in Iran for two extended periods of time between August of 1978 and November of 1978 in order to provide consulting advice and to adjust

and correct problems in the operational status of the equipment. It appeared further that by the end of November, 1978, the machinery and equipment were fully operational and Werner claims that numerous assurances were given to it by State Cereal Organization that the written preliminary acceptance was to be issued momentarily. At this point in time, according to the plaintiff, the revolution in Iran was in full sway and, in fact, the official responsible for executing the written preliminary acceptance "was in the process of issuing the final written preliminary acceptance when he was arrested by armed revolutionary forces."

To complicate the matter further, it now appears that the Letter of Credit issued through Bank Markazi, Iran, and Detroit Bank and Trust Company of Detroit, Michigan, in favor of Werner, expired on September 2, 1979. It is plaintiff's claim that State Cereal Organization had requested that plaintiff extend the Harris Letter of Credit until April 5, 1980, to which plaintiff agreed but with the understanding that at the same time, the State Cereal Organization Letter of Credit through Bank Markazi and Detroit Bank and Trust Company would also be extended. The latter, however, was not extended and expired September 2, 1979. In support of its position, plaintiff introduced into evidence (Exhibit 1) a copy of a telegram which it had sent via the Union Bank in Grand Rapids to Harris under date of August 31, 1979, which reads as follows:

"WERNER LEHARA INTERNATIONAL INC HAS APPROVED EXTENSION OF LETTER OF CREDIT # SP21571 UNTIL APRIL 5, 1980.
AS BEFORE THEY HAVE REQUESTED THE FOLLOWING MESSAGE BE SENT ON THEIR BEHALF TO BANK MELLI
CONCURRENT WITH WERNER LEHARA EXTENSION OF LC SP21571 WE ANTICIPATE THAT YOUR CLIENT (STATE CEREAL ORGANIZATION OF IRAN) WILL INSTRUCT BANK MARKAZI, IRAN, TO EXTEND THEIR LC 111513/90/87904 THROUGH THE DETROIT BANK AND TRUST COMPANY."

Plaintiff concedes that, at the present time, no call has been made on the Letter of Credit. Likewise, it is acknowledged by all parties that on November 14, 1979, President Carter issued an Executive Proclamation freezing Iranian funds in the United States. However, it is what may happen when and if that Executive Proclamation is rescinded that has prompted plaintiff to file this lawsuit.

In summary, it is plaintiff's claim that an injunction should be issued because: (1) the Iranian situation politically is so complex and unpredictable that it is impossible to ascertain whether or not there is an existing governmental entity which is a party to the contract; (2) that Werner will be exposed to the whimsical or capricious action of the Iranian Government in demanding payment on the Harris Letter of Credit despite the breach of contract by the State Cereal Organization; (3) that the Letter of Credit was obtained at a time when Iran was in the hands of the Imperial Government of Iran and it was never contemplated that the revolutionary government would overthrow the Imperial Government; (4) the Harris Letter of Credit is payable to Bank Melli as agent of the State Cereal Organization of the Ministry of the Commerce of the Imperial Government of Iran. Since the Government has been overthrown, any demand for payment by Bank Melli necessarily would be fraudulent; (5) Werner should not be forced to pay over (through the mechanism of the Harris Letter of Credit) the amount of $156,095.00 for the reason that the Harris Letter of Credit was originally issued as a guarantee of Werner's good performance and Werner, in fact, has performed all its obligations under the contract; (6) Werner claims that it has never recognized or accepted the substitution of the new revolutionary government of Iran as a party to the contract and its agreement to extend the Harris Letter of Credit was made under duress; and (7) failure of State Cereal Organization to extend the Bank Markazi Iran Letter of Cred-

it as plaintiff had expected and at the same time inducing plaintiff to extend the Harris Letter of Credit constituted "fraud in the transaction" justifying a dishonoring of any call upon the Harris Letter.

In response, Harris moves to dismiss on the grounds that this court lacks jurisdiction over the person of the defendant, claiming that defendant does no business within the district. In the alternative, defendant moves to dismiss on the grounds that indispensible parties (Union Bank and Bank Melli) have not been made either plaintiffs or defendants in this litigation. It claims that the Union Bank and Trust Company located in Grand Rapids is an indispensible party in that it would be liable to defendant Harris for any sums advanced pursuant to said Letter of Credit as well as for expenses and attorney fees. Defendant further claims that Bank Melli, the beneficiary of said letter, has certain unconditional rights under the terms of said letter and is a necessary party to this litigation. And, finally, defendant claims that the complaint fails to state a claim upon which relief can be granted against Harris on the basis that the complaint alleges a series of contract breaches by certain Iranian entities, but fails to allege any facts which could or would as a matter of law permit or require Harris to refuse to honor its Letter of Credit pursuant to the terms of Chapter 26, Section 5–114(1), Illinois Rev.Stats.1977 (Uniform Commercial Code) as well as terms of the "Uniform Customs and Practice for Documentary Credits" (1974 Revision), International Chamber of Commerce Publication 290.

## JURISDICTION OVER THE DEFENDANT

■ The first attack by the defendant upon plaintiff's claim centers around the allegation that in this diversity action defendant Harris is not subject to suit within the State of Michigan. Plaintiff is a resident of the Western District of Michigan and defendant is a banking institution located in Chicago, Illinois. Service of process was made upon defendant at its corporate headquarters in Chicago. Defendant is not incorporated in Michigan; has no offices in Michigan and has not consented to the general personal jurisdiction of the Michigan courts. The question before this court is whether the Michigan long-arm statute (M.C.L.A. § 600.715; M.S.A. § 27A.715) extends the jurisdiction of its courts to non-resident defendants in the position of the Harris Trust and Savings Company?

A review of the Michigan cases makes clear that this statute has been interpreted by the Michigan Supreme Court as extending the jurisdiction of the Michigan courts to the fullest extent permitted by the due process clause. *Microelectronic Systems Corp. of America v. Bamberger's*, 434 F.Supp. 168 (E.D.Mich.1977); *McGraw v. Matthaei*, 340 F.Supp. 162 (E.D.Mich.1972); *Sifers v. Horen*, 385 Mich. 195, 188 N.W.2d 623 (1971); *Stan Sax Corp. v. Siefen Compounds, Inc.*, 68 Mich.App. 768, 243 N.W.2d 724 (1976). The due process limitation on personal jurisdiction has been explained by the United States Supreme Court in three well-known cases: *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

The Sixth Circuit, in interpreting these cases, has set forth three tests or guidelines to assist in ascertaining the outer limits of personal jurisdiction. See *Southern Machine Company v. Mohasco Industries, Inc.*, 401 F.2d 374, at p. 381 (1968), as follows:

"First, the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.

Second, the cause of action must arise from the defendant's activities there.

Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable."

This court agrees with plaintiff that these prerequisites for jurisdiction have been met.

Plaintiff is engaged in international trade, including the manufacture of equipment necessary to set up bakeries in foreign countries. Its local bank is the Union Bank and Trust Company, ("Union") located in Grand Rapids. In order to guarantee payment from the Iranian Government, as well as to guarantee to the Iranian owners its own performance, plaintiff agreed to an arrangement whereby Letters of Credit would be established. The evidence demonstrated that Union is not equipped to handle international financing by use of Letters of Credit. Consequently, when the plaintiff explained what it needed to Union, it in turn approached Harris. Harris was not selected by a blind draw. On the contrary, for a period in excess of at least seventeen years, Harris has acted as a correspondent bank for Union and has had general commercial transactions with it on almost a daily basis. With respect to its capabilities in the international trade market, it has on a fairly regular basis, solicited business from Union in Grand Rapids, Michigan. This has been accomplished by sending one or more representatives to Grand Rapids to meet the officers at the Union Bank, get better acquainted and, generally, to make known what services would be available at Harris to Michigan customers of Union interested in Letters of Credit or other international financial vehicles. These personal "get acquainted" (solicitation?) visits to Grand Rapids were estimated by a Union Vice President to be on a quarterly basis. Likewise, the testimony established that on occasion Union officials made visits to the International Department of Harris in Chicago for discussion of International financial problems of Union's customers. The Union official estimated that approximately three international Letters of Credit per year are issued by Harris for Union Michigan customers.

As Judge Celebrezze pointed out in a long and scholarly opinion in *Southern Machine Company, supra*, the rule is easy to recite, but difficult to apply. In that opinion quoting from the landmark case of *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the court points out that "the minimum contacts necessary with the state wherein the suit is filed must be such that the maintenance of the suit does not offend "traditional notions of fairplay and substantial justice."

In a recent malpractice action, the Michigan Court of Appeals was called upon to test the extent of Michigan's jurisdiction where a Michigan plaintiff-patient received what was claimed to be less than standard medical attention from a South Bend, Indiana, medical clinic. The Michigan Court of Appeals in *Woodward v. Keenan,* 79 Mich. App. 543 (1977), 261 N.W.2d 80, at page 83, said:

> "If, with the advent of advertising by professionals * * * Michigan residents are encouraged on a systematic or continuous basis to utilize professional facilities outside of Michigan, then those offering this encouragement will have purposefully availed themselves of the privilege of conducting activities within Michigan and thereby have become amenable to the personal jurisdiction of our courts."

Without agonizing over the interpretation and analysis of the meaning of "systematic" or "continuous", it seems to this court that a practical overview of Harris's activities in Michigan brings it well within the rule set down in *International, supra, Southern Machine Company, supra,* and *Woodward, supra.* Harris has an ongoing service and expertise in international financing not available to the plaintiff at Union in Grand Rapids. Harris actively solicited this business in Michigan and, apparently, has been doing so for many years. Fiction or not, it is hard to refute the argument that Harris made a calculated decision that the benefits of increased revenues from Michigan customers offset the potential exposure to suit in Michigan.

And, finally, this dispute is clearly one of major interest to those in Michigan involved

in international trade. Michigan business has very substantial international ties, many of them financed by Letters of Credit. Consequently, the interest of the State of Michigan in the resolution of this conflict is very considerable. As Judge Celebrezze said in *Southern, supra,* page 385:

> "We should be careful not to subvert expressed interests of Tennessee by a too grudging interpretation of the long arm statute or a too restrictive view of the requirements of due process."

The court concludes and finds that the defendant Harris Trust and Savings Bank is subject to the jurisdiction of this court.

## CRITERIA FOR PRELIMINARY INJUNCTIONS

The Sixth Circuit has set forth in clear and unmistakable terms four standards which must be considered prior to granting the extraordinary remedy of a preliminary injunction. See *Mason County Medical Association v. Knebel,* 563 F.2d 256 at 261 (1977):

> "In determining on appeal whether the District Court abused its discretion in granting or withholding preliminary injunctive relief, this court has set forth four standards which must be considered:
>
> 1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;
>
> 2) Whether the plaintiffs have shown irreparable injury;
>
> 3) Whether the issuance of a preliminary injunction would cause substantial harm to others;
>
> 4) Whether the public interest would be served by issuing a preliminary injunction.

## PROBABLE SUCCESS ON THE MERITS

On the present state of the record this court, of course, cannot and does not, adjudicate the merits of plaintiff's underlying cause of action. However, from the testimony as well as the exhibits, supporting briefs and oral argument, this court concludes that plaintiff has failed to show a strong or substantial likelihood or probability of success on the merits.

First of all, by virtue of the Letter of Credit, Harris is subject to the UCP.[2] Likewise, there can be no question that a bank's obligation under a Letter of Credit is totally independent of the underlying transaction. UCP General Provisions and Definitions Paragraph c and Article 8(a) provides:

> "c. Credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts.
>
> 8(a) In documentary credit operations, all parties concerned deal in documents and not in goods."

In the recent case of *KMW International v. Chase Manhattan Bank,* 606 F.2d 10 (2nd Cir. 1979), the court in passing on a similar Letter of Credit issued by Chase Manhattan Bank had the following to say, at p. 16:

> "As a leading commentator has pointed out, 'the financial value of the letter of credit promised is predicated upon its degree of legal certainty.' B. Kozolchyk, Commercial Letters of Credit in the Americas, ¶ 18.04(1), at 394–95 (1966). The issuing bank's obligation under an international irrevocable letter of credit may not be modified without the consent of both customer and the beneficiary. UCP Article 3(C). See also, NY UCC ¶ 5–106(2). There is nothing in the UCC or the UCP which excuses an issuing bank from paying a letter of credit because of supervening illegality, impossibility, war or insurrection. Indeed, Article 8(c) of the UCP provides the opposite, viz., that a bank suspecting noncongruence with terms and conditions of credit 'must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not

---

2. Uniform Customs and Practices for Documentary Credits (1974 Revision), International Chamber of Commerce Publication No. 290.

effected in accordance with the terms and conditions of the credit.' "

■■ In the present case, plaintiff does not dispute the principles set forth above, but strenuously argues that it is the innocent victim of fraud. Plaintiff argues that this court should prevent defendant from honoring any call on the Harris Letter of Credit on the grounds that fraud "in the transaction" exposes plaintiff to an unwarranted loss of $156,095.00. *KMW,* at page 209, 606 F.2d at 15 n.3, confirms that fraud may be a legitimate defense for an issuing bank to refuse to honor a call:

"This does not, however, take away from the point that apparent 'fraud in the transaction' or fraudulent documentation may be a defense under either the UCC or the UCP. *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 258 n.2, 392 N.Y.S.2d 265, 269 n.2, 360 N.E.2d 943, 947 n.2 (1976)."

Plaintiff also calls the court's attention to *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (1941), for the same proposition. Conceding fraud to be a legitimate defense, the problem in this case is the lack of proof. There can be no question that the plaintiff was expecting that its guarantee of payment would be handled through credit documents issued at the Bank Markazi, Iran. This is spelled out in *ARTICLE XV—PAYMENT TERMS* of the contract as follows:

"The employer undertakes to make payments to the Contractor in accordance with the following terms:

15.1. For first payment (portion?), the following sum, through credit document at the Bank Markazi Iran equivalent to exchange value of cost determined by the Contractor to the seller of the said machinery according to the specifications announced by Contractor."

Thereafter, Letter of Credit Number 09/87904 of the Bank Markazi Iran, Tehran, Iran, in the amount of U.S. $1,560,685.00 was issued. The Detroit Bank and Trust Company was acting in an "advisory capacity" and payments under the Letter of Credit actually came through the Detroit Bank and Trust Company. The allegation of fraud hinges around the circumstances for the expiration of this Letter of Credit. The parties agree that 80% of the total obligation was drawn under the credit and it is the remaining 20% which is at issue. Due to a series of delays, the original Letter of Credit which was to expire on June 27, 1977, was extended by agreement of both parties on a number of occasions. On April 19, 1979, it was extended to December 2, 1979, but then on August 15, 1979, the expiration date was moved back to September 2, 1979. This revision was approved by the plaintiff under date of August 20, 1979. Thereafter (September 4, 1979), plaintiff approved extension of the Harris Letter of Credit until April 5, 1980. It is the claim of the plaintiff that it never would have approved that extension had it known that the Bank Markazi Iran Letter of Credit was going to expire on September 2, 1979.

What the plaintiff may have hoped or expected is something quite different from having a fraud perpetrated upon it. As pointed out earlier, Union sent to Harris a telex (Exhibit 1) stating that plaintiff had approved the extension of the Harris letter of credit and then added:

"AS BEFORE THEY HAVE REQUESTED THE FOLLOWING MESSAGE BE SENT ON THEIR BEHALF TO BANK MELLI
CONCURRENT WITH WERNER LEHARA EXTENSION OF LC SP21571 WE ANTICIPATE THAT YOUR CLIENT (STATE CEREAL ORGANIZATION OF IRAN) WILL INSTRUCT BANK MARKAZI, IRAN, TO EXTEND THEIR LC 111513/90/87904 THROUGH THE DETROIT BANK AND TRUST COMPANY."

This after-the-fact "anticipation" is quite different from a legally binding agreement that an extension of one letter of credit was made explicitly conditioned upon the extension of the other. Presumably, if that had been the intention of plaintiff, it could have been so arranged through the use of escrow agents or other legally acceptable methods. In any event, to extend the Harris Letter of

Credit unconditionally and then notify the purchaser that it was expected to do likewise on its Letter of Credit, does not at least on the meager evidence submitted to this court, constitute fraud when the latter fails to do so. In its brief to the court, the plaintiff cites a number of cases supporting the proposition that fraud is a justification for the issuance of a preliminary injunction but fails to point out any evidence either in the testimony submitted in open court or in affidavits upon which this court could conclude that plaintiff has proof of "fraud in the transaction."

## IRREPARABLE INJURY

Should Harris, upon demand, make payment to Bank Melli, in violation of the letter of credit, no question exists that money damages from Harris could be awarded. Likewise, no one has made the argument to this court that Harris would not be able to satisfy a money judgment against it. Plaintiff, however, argues at great length that at this writing the Country of Iran is in political shambles and that its illegal seizure of American hostages is an indication of its irresponsible, outlandish and illegal conduct.[3] Without question, as of this date at least, the present Islamic Republic appears to be under the absolute control of the Ayatollah, who, in the language of this morning's paper, is a "dedicated, calculating, rancorous, implacable, old man, who would sacrifice Iran's oil wealth, his own safety, life itself to pursue his goals." Certainly, the present government of Iran (whatever that might be) would have no regard or interest in paying off the balance it may owe an American company. Likewise, no one doubts resort to the Iranian courts would be worthless and futile. Nevertheless, it should be noted that there is no evidence in this case at least that the Bank Markazi Iran is not continuing its normal banking functions or that daily commercial transactions between Iran and other countries and other parties is not going on. To the contrary, it is apparent that Iran is continuing to sell its oil abroad and generally continuing with its international trade. Further, there is no proof that Bank Markazi Iran has nor intends to arbitrarily withhold payment for the balance due under this contract. Plaintiff's own Exhibit # 3 is a letter from Bank Markazi Iran to the Detroit Bank and Trust bearing date of November 12, 1979, which reads as follows:

"Cable MARKAZBANK      Our Ref. No. _____
        212359
Telex:  212503 MZBK IR
        213119            Date:  Nov. 12, 79
P.O. BOX...362

            BANK MARKAZI IRAN
            (The Central Bank of Iran)
         Ferdowsi Avenue, Tehran, Iran

Detroit Bank & Trust
Post Office Box 858
Detroit Michigan   48231
U.S.A.
        Subject:  Our L/C No.09/87904
                  Your Ref.# 111513

Dear Sirs:

Upon our orderers request please relay the following information to beneficiaries:

Instruction for payment of the remaining 20% of the credit amount will be issued after the provisional delivery of the plant has been done. Therefore it is not necessary to extend validity of the credit amount they can be sure of payment if delivery is properly done.

            Very truly yours,
            /s/
            BANK MARKAZI IRAN"

True, one may anticipate (particularly if the political crisis continues to deteriorate) that the Harris Letter of Credit will, in fact, be called. Yet, to the present time, no such call has been made.

And, finally, as similarly pointed out in *American Bell International Inc. v. Islamic Republic of Iran,* United States District Court, SDNY, 1979, 27 UCC Reporting Service 223, 474 F.Supp. 420, Werner may well

---

**3.** Although there has been a change of government in Iran since the Harris Letter of Credit was issued, the United States has recognized the succeeding government. Likewise, the fact that the Iranian banks have been nationalized is not a fact either party claims is material to any issue before this court.

have an adequate damage remedy against the potential Iranian defendants under the Sovereign Immunity Act, 28 U.S.C. § 1605(a)(2), 1610(b)(2), (Supp. 1979). Plaintiff claims § 1611 makes the property "of a foreign central bank" immune from attachment and execution. Without deciding that issue it is noted the exemption applies to the foreign banks "own account" which may well not be applicable to Letters of Credit. In any event, this court concludes Werner has failed to establish irreparable harm. See also *United Technologies Corp. v. Citibank, N.A.,* United States District Court, S.D.N.Y., 1979, 469 F.Supp. 473.

## SUBSTANTIAL HARM TO OTHERS

Defendant Harris, in alleging serious harm to itself if an injunction is issued, makes the same argument with equal force that was made by Chase in *KMW supra.* Harris's commercial honor is essentially at stake. Harris argues that the entry of an injunction would expose Harris to litigation with Bank Melli, or the possible seizure by Bank Melli of Harris assets wherever they might be located. In addition, failure to perform on its irrevocable letter of credit would constitute a breach of trust and could well injure Harris's reputation in the international trade business. In balancing the equities between the plaintiff and Harris, it should be noted that when the plaintiff undertook to do business in Iran, or in any other country for that matter, it subjected itself to the risks of revolution, political upheaval, insurrections, wars and the like. The facts as they appear in this case are typical of the risks that an American company takes when it does business abroad and to attempt to shift some part or all of that risk to defendant by the issuance of a preliminary injunction would unfairly cause substantial harm to Harris.

## PUBLIC INTEREST

If this were a suit by plaintiff against the purchaser of the equipment in Iran, one could argue that the outrageous conduct of the political leaders in Iran would be so overwhelming that public interest would demand that the Letter of Credit be cancelled. That, however, is not this case. No Iranian entity is a party to this case. This is a suit by an understandably worried and aggrieved manufacturer of baking equipment against the Harris Trust and Savings Bank which is not responsible for the upheaval in Iran and who, in good faith, undertook to issue the Letter of Credit. There is nothing in the record which indicates to this court that the public interest would be served by issuing a preliminary injunction.

## CONCLUSION

For the reasons set forth above, general considerations of equity compel this court to deny the motion for temporary injunction. As stated in *American Bell, supra,* 27 UCC Reporting Service page 232, 474 F.Supp. page 426:

" * * * To be sure, the sequence of events that led up to that demand may well have been unforeseeable when the contracts were signed. To this extent, both Bell and Manufacturers have been made the unwitting and innocent victims of tumultuous events beyond their control. But, as between two innocents, the party who undertakes by contract the risk of political uncertainty and governmental caprice must bear the consequences when the risk comes home to roost."

Likewise, as between Werner and Harris, it is the former that undertook this particular risk—not the latter.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

Accordingly, plaintiff's motion for a preliminary injunction, except as hereinafter provided, is denied and the temporary restraining order heretofore entered, as extended, is dissolved. Again, however, in following the suggested course of action set forth in *KMW, supra,* this court directs Harris to provide Werner with three days written notice of a receipt of a demand for payment before making payment thereon. Such notice will provide Werner an oppor-

tunity to take such action at that time as it may deem appropriate in light of conditions then existing.

SO ORDERED.