ITEK CORPORATION, Plaintiff,

v.

The FIRST NATIONAL BANK OF BOSTON and Bank Melli Iran, Defendants.

Civ. A. No. 80–58–MA.

United States District Court, D. Massachusetts.

April 10, 1981.

Thomas D. Edwards, Richard L. Dahlen, Chaplin, Casner & Edwards, Boston, Mass., for plaintiff.

Rory Fitzpatrick, Thomas H. Walsh, Jr., E. Susan Garsh, Bingham, Dana & Gould, Boston, Mass., Harold Foster, Halligan & Foster, New York City, William Zucker, Gadsby & Hannah, Boston, Mass., for defendants.

## OPINION

MAZZONE, District Judge.

In this action, plaintiff Itek Corporation (Itek) seeks an order terminating its liability on certain letters of credit. Jurisdiction is invoked under 12 U.S.C. § 632.

The plaintiff is a corporation duly organized under the laws of the State of Delaware with its principal place of business in Lexington, Massachusetts. Defendant The First National Bank of Boston (FNB), is a national banking association duly organized under the laws of the United States with its principal place of business in Boston, Massachusetts. Defendant Bank Melli Iran (Bank Melli) is an agency or instrumentality of the government of Iran. Personal jurisdiction over Bank Melli is invoked under 28 U.S.C. § 1330(a).[1]

The plaintiff has moved for a preliminary injunction and Bank Melli has moved for a continuance. A hearing on these motions was held March 18, 1981. Because of the extended history of this action, the essentially uncontested facts[2] and a description of the prior proceedings are stated at the outset.

## STATEMENT OF FACTS AND PROCEEDINGS

On or about April 12, 1977, Itek entered into a contract (Contract No. 113) with the Imperial Government of Iran (Imperial Government) for the manufacture of certain high-technology optical equipment at an agreed price of $22,500,000. Contract No. 113 required Itek to furnish the Imperial Government with four bank guaranties each in the amount of $1,125,000, issued by an Iranian bank, naming the Imperial Ministry of War as beneficiary. The guaranties were intended to secure Itek's repayment of an advance payment by the Imperial Government of $4,500,000, in the event of premature termination of the contract. The contract also required Itek to furnish

---

1. The issues of personal and subject matter jurisdiction were not briefed or argued in connection with the instant motions. Accordingly, we do not rule on those issues at this time.

2. Plaintiff has filed numerous affidavits and other materials in support of its motion for a preliminary injunction and prior motions. While defendants have filed a number of documents during the course of the litigation, neither has filed counter-affidavits disputing the facts alleged by plaintiff. Nor have they taken advantage of the opportunity to present oral testimony.

This Court has the authority to rule on plaintiff's motion on the basis of affidavits alone, without requiring oral testimony. *San Francisco-Oakland Newspaper Guild v. Kennedy*, 412 F.2d 541, 546 (9th Cir. 1969); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204–05 (2d Cir. 1970). In considering a motion for preliminary relief plaintiff's factual assertions, insofar as they are unrebutted by defendants, are accepted as true. *Walter E. Heller & Company, Inc. v. Cox*, 379 F.Supp. 299, 301–02 (S.D.N.Y.1974); *Williams v. San Francisco Unified School District*, 340 F.Supp. 438, 442 (N.D. Cal.1972).

another bank guaranty in the amount of $2,250,000, also issued by an Iranian bank and naming the Ministry of War as beneficiary, securing Itek's good performance of its contractual obligations.

Itek procured the required guaranties from defendant Bank Melli, a wholly-owned instrumentality of the Imperial Government.

As a condition to issuing the guaranties, Bank Melli required Itek to furnish letters of credit in its favor, issued by an American bank, with amounts and terms similar to those of its guaranties. Itek complied with this condition by furnishing five letters of credit [3] issued by FNB, each naming Bank Melli as beneficiary.

The letters of credit issued by FNB each required, as a condition to payment, an authenticated cable stating that Bank Melli had been required by the Ministry of War of the Imperial Government to make payment under its corresponding guaranty and that it was airmailing to FNB a signed statement to that effect.

Itek's contract with the Imperial Government provided that in the event of the occurrence of "force majeure" including the cancellation of the United States' export license covering the equipment, either party was entitled to inform the other of the event constituting force majeure and, after three months, to cancel the contract by written notice. The contract further provided that, in the event of cancellation, the parties would clear their account and release all guaranties and letters of credit.

After Contract No. 113 was executed, Itek proceeded to perform its contractual obligations. An independent American company monitored the progress of the work and consistently gave Itek exceptionally high performance ratings for its efforts, which were ahead of schedule. By February 10, 1979, the value of Itek's performance amounted to $20,300,000. Including the $4,500,000 advance, Itek had been paid a total of $11,100,000.

During January and February, 1979, Iran underwent a revolution. Ultimately, the head of the Imperial Government, Shah Riza Pahlevi, was driven into exile. His successor in power, the Moslem religious leader Ayatollah Ruhollah Khomeini, proclaimed the abolition of the Imperial Government and the institution of an "Islamic Republic." The Ministry of War was abolished. In its place a "Ministry of National Defense" was created.[4]

On April 30, 1979, the State Department cancelled the export license for equipment covered by Contract No. 113. Between February and May, 1979, Itek notified Iranian authorities in writing of the non-payment of its invoices and, on May 15, 1979, of the occurrence of force majeure. Consultations were requested in accordance with the provisions of the contract.

On August 20, 1979, representatives of Itek met in Tehran, Iran, with officials of the Ministry of Defense to discuss the occurrence of force majeure and the possibility of continuing the contract work. At this meeting, Itek's representatives presented the Iranian participants with copies of all unpaid invoices and a summary of the account under the contract.[5]

---

3. Of the five original letters of credit, the following three remained outstanding as of the date the complaint was filed and are the subject of this action:

| Number | Original Amount | Amount Outstanding as of 1/9/80 | Original Expiration date | Extended Expiration date |
|---|---|---|---|---|
| S–14555 | $2,250,000 | $2,250,000 | Feb. 15, 1981 | – – |
| S–14558 | $1,125,000 | $ 70,753 | Feb. 15, 1979 | Apr. 17, 1980 |
| S–14559 | $1,125,000 | $1,125,000 | Oct. 15, 1979 | Apr. 17, 1980 |

4. It is not apparent from the record whether the Ministry of Defense is the same entity as the Ministry of War with a new name, or a different entity.

5. Itek maintains that the presentation of these invoices and this summary effected a clearing of the down-payment amount within the meaning of article 9.5 of the contract.

On November 3, 1979, 200 Iranian students forcibly took control of the United States Embassy and seized 52 American citizens. In response, President Carter on November 14, 1979, declared a national emergency and, by Executive Order No. 12,170, 44 Fed.Reg. 65,729 (1979), "blocked" all Iranian assets.[6]

Shortly after the issuance of the blocking order, the Treasury Department promulgated regulations to implement the Presidential directive that all assets be blocked. Iranian Asset Control Regulations, 31 C.F.R. § 535.101, et seq. (1979). The Regulations prohibited the transfer of any property subject to the jurisdiction of the United States in which Iran had any interest of any nature whatsoever, except as authorized by license or regulation. 31 C.F.R. § 535.201. The Regulations specifically authorized payments by United States banks on letters of credit issued in favor of an Iranian entity, provided the payments were made into blocked accounts in domestic banks. 31 C.F.R. §§ 535.416, 635.508. Section 535.568 established an alternative mechanism for the creation of blocked accounts in the case of standby letters of credit. Subsection (e) provided:

> Nothing in this section precludes any person for whose account a standby letter of credit was opened or any other person from contesting the legality of the demand from the Iranian entity or from raising any other legal defense to payment under the standby letter of credit.

31 C.F.R. § 535.568(e).[7]

On December 6, 1979, Itek sent the Ministry of Defense another written notice pursuant to section 8.6 of the contract, advising of the occurrence of force majeure, and requesting further consultations on the matter. Itek received no response to this communication.

On January 9, 1980, Itek commenced this action against FNB, alleging an outstanding balance due under Contract No. 113 of $9,200,000.[8] In its complaint and supporting affidavits, Itek claimed it was highly likely that persons in Iran with access to relevant bank records would fraudulently demand payment from FNB on the letters of credit then outstanding. See n. 3 supra. Itek accordingly requested temporary and permanent relief in the form of an order enjoining FNB from honoring any demand on the letters of credit without giving the plaintiff at least five days notice of its intent to do so. On January 9, 1980, this Court temporarily restrained FNB from honoring any such demand without first giving Itek three days notice. Following a hearing, on January 18, 1980, this Court entered a preliminary injunction to the same effect.

Early in February and March, 1980, Bank Melli sent FNB telexes requesting extensions on two of the outstanding letters of credit corresponding with Bank Melli's guaranties of the down payment.[9] In the alternative, Bank Melli requested payment in full against those two letters of credit. Meanwhile, on March 7, 1980, Itek had sent the Ministry of Defense written notice cancelling Contract No. 113, and demanding the release of all bank guarantees and letters of credit. Itek refused to grant Bank Melli's request for extensions on the ground that the letters should have been released

---

**6.** The Order, entitled "Blocking Iranian Government Property," stated in relevant part:

> I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

**7.** There are indications in the record that Itek exercised its rights under these regulations by establishing a blocked account pursuant to section 535.568(b). See Plaintiff's Motion for Ex-

tension of Temporary Restraining Order, (March 18, 1980). In view of the provisions of subsection (e), supra, we do not believe the establishment of such an account, if in fact it occurred, has any bearing upon our resolution of the instant motions.

**8.** A separate action, in which Itek seeks to recover the $9,200,000, is presently pending before this Court. See, Itek Corporation v. The Government of Iran, et al., No. 79–2383–MA.

**9.** The letters were Nos. S–14558 and S–14559. See n. 3 supra.

no later than four weeks after clearance of the down payment amount, which Itek claims occurred on August 20, 1979 and, in any event, not later than December 6, 1979.

On March 11, 1980, Itek filed an amended complaint reciting the new developments and again seeking temporary relief. On that date, we entered a temporary order restraining the defendant FNB from honoring any demand upon letters of credit issued by it and having serial numbers S–14555, S–14558 and S–14559. The restraining order was extended on March 20 and again on March 28, 1980, without objection.

On March 16, 1980, FNB received a telex from Bank Melli, formally demanding payment of the three outstanding letters of credit.[10] On March 19, 1980, plaintiff again amended its complaint, and added Bank Melli as a defendant.

On April 10, 1980, Bank Melli moved for a stay of proceedings pending action by the Judicial Panel for Multidistrict Litigation (Panel). As part of its motion, Bank Melli consented to a continuance of the temporary restraining order during the period of the stay, reserving the right to move to vacate the order at any time upon appropriate notice. On April 14, 1980, the United States Government appeared and requested a stay of proceedings as warranted by national interest. On April 14, 1980, we

granted defendant's motion for a stay and ruled that the temporary restraining order would continue until further order of the Court. On July 21, 1980, the Panel denied Bank Melli's motion for transfer. Thereafter, the United States filed further Suggestions of Interest for a stay.

On January 19, 1981, the United States reached an agreement[11] with the Government of Iran for the release from captivity of the 52 American hostages. As a part of the Iranian Hostage Agreement President Carter agreed to direct the Federal Reserve Bank of New York to transfer Iranian assets held by it to an escrow account in the Bank of England for retransfer to Iran upon release of the hostages. The United States also agreed to terminate certain legal proceedings in United States courts involving claims of United States' persons and institutions against Iran and its state enterprises; to prohibit further litigation based on such claims; and to bring about the termination of such claims through binding arbitration.[12]

In order to fulfill the United States' commitment under the Iranian Hostage Agreement, President Carter, on January 19, 1981, issued a series of Executive Orders revoking the conditional licenses previously issued for prejudgment attachments of Iranian assets; nullifying non-Iranian rights in

**10.** The telex read, in pertinent part, as follows: YOUR CREDITS S–14558, S–14559 AND S–14555 OUR GUARANTEES 29369/D, 29370/D AND 29366/D FOR USLRS 70.753 USDLRS 125,000 AND USLRS 2.250,000 BENEFICIARIES HAVE WRITTEN CLAIMING CREDITS AMOUNT AND WE CONFIRM THAT WE HAVE BEEN REQUIRED TO PAY UNDER OUR GUARANTEES STOP PLS THEREFORE CREDIT OUR ACC WITH OUR LONDON BR WITH USDLRS 3.445.753 UNDER TELADVICE TO US AND OUR HO STOP DELAY INTEREST WILL ACCRUE AT 12./. P.A. FROM DATE OF CLAIM UNTIL WE RECEIVE REIMBURSEMENT.

**11.** The agreement was memorialized in two Declarations adhered to by the United States and Iran: (1) Declaration of the Government of the Democratic and Popular Republic of Algeria (Declaration I); and (2) Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the

Islamic Republic of Iran (Declaration II). We shall refer to the Declarations collectively as the Iranian Hostage Agreement.

**12.** The Declarations provided, in pertinent part:

An International Arbitral Tribunal (the Iran-United States Claims Tribunal) is hereby established for the purpose of deciding claims of nationals of the United States against Iran and claims of nationals of Iran against the United States, and any counterclaim which arises out of the same contract, transaction or occurrence that constitutes the subject matter of that national's claim, if such claims and counterclaims are outstanding on the date of this agreement, whether or not filed with any court, and arise out of debts, contracts (*including transactions which are the subject of letters of credit or bank guarantees*).

(Declaration II, Article II, ¶ 1) (emphasis added).

assets acquired since the issuance of the blocking order; precluding persons subject to United States' jurisdiction from acquiring further interests in blocked property; directing those holding blocked Iranian funds and securities to transfer them to the Federal Reserve Bank of New York for disposition as the Secretary of Treasury thereafter directed; and requiring those holding other Iranian property in the United States to transfer the property as directed by Iran. Executive Orders Nos. 12,277–12,281, 46 Fed.Reg. 7915–7924 (Jan. 23, 1981). In addition, the President revoked and nullified all prior licenses issued by the Treasury for maintenance of judicial proceedings against Iranian entities or for exercising any right over such properties. Executive Order No. 12279, § 1–102.

In response to the President's actions, Itek on January 23, 1981, in what it described as "an abundance of caution" to guard against the possibility that the FNB might pay over funds related to the letters of credit in suit in reliance upon the Executive Orders, requested a further temporary restraining order preventing any such payment. An order continuing the existing temporary restraining order was issued on January 26, 1981, and remains in effect by agreement of the parties.

The final chapter in these admittedly complex and rather convoluted proceedings began on February 24, 1981, when the Secretary of the Treasury amended the Iranian Asset Control Regulations in order to implement President Carter's recent Executive Orders.[13] 31 C.F.R. Part 535, 46 Fed.Reg. 14330 (February 26, 1981). Subsection 535.-222 provides for the suspension of all claims eligible for submission to the Claims Tribunal described *supra*. Subsection (g) states:

> Nothing in this section shall apply to any claim concerning the validity or payment of a standby letter of credit, performance

or payment bonds, or other similar instrument.[14]

Itek now seeks a ruling on its motion for a preliminary injunction, contending *inter alia* that its claims are specifically exempt from suspension and submission to international arbitration pursuant to the Declarations, Executive Orders, and Treasury Regulations discussed *supra*; there is presently no obstacle, legal or otherwise, to our ruling on plaintiff's motion; and continuing the temporary restraining order in effect since March 11, 1980 unfairly burdens Itek because the defendants are free to withdraw their consent to further extensions at any time.

Bank Melli opposes plaintiff's motion and requests a further continuance, maintaining that Itek's claim *is* subject to the international arbitration mechanism established by the United States and Iran; by executive order *all* litigation covered by the Algerian Declarations is suspended; since the matter is subject to dispute, this Court should not proceed until Iran and the United States have had a further opportunity to agree on how letter of credit cases are to be treated; and, in any event, since Bank Melli consents to an extension of the temporary restraining order now in force, no prejudice to Itek will result from a further continuance.

## BANK MELLI'S APPLICATION FOR A CONTINUANCE

The thrust of defendant's request for a continuance is that this Court lacks authority to act on Itek's motion for a preliminary injunction. In support of its argument, Bank Melli relies principally upon language in Declaration I adhered to by the United States and Iran, *see* n. 11 *supra*, to the effect that the parties intended to terminate *all* litigation between the two govern-

---

**13.** Also on February 24, President Reagan issued an order suspending all claims which may be presented to the International Arbitral Tribunal under the terms of Article II of Declaration II. During the period of this suspension, the Order provided, no such claims shall have any legal effect in any action now pending in any court of the United States. Executive Order No. 12,294, § 1 (Feb. 24, 1981).

**14.** The most recent Statement of Interest filed by the United States states that claims *not* subject to the international arbitration mechanism may continue to be litigated in United States Courts. Statement of Interest of the United States, at 23, (February 26, 1971).

ments and their respective citizens and instrumentalities. In addition, Bank Melli cites Article II of Declaration II, n. 12 *supra*, which lists transactions which are the subject of letters of credit or bank guarantees among the types of claims within the exclusive jurisdiction of the International Arbitral Tribunal to be established pursuant to the Iranian Hostage Agreement.

Were we to agree that Presidents Carter and Reagan, in adhering to the Declarations and in promulgating the Executive Orders discussed *supra* intended to terminate suits of this kind, we would have to address several complex and sensitive questions concerning the validity of those orders and the scope of the President's authority to issue them. *Compare Chas. T. Main International, Inc. v. United States: Ronald Reagan and Donald Regan*, 509 F.Supp. 1162 at 1163–1166 (D.Mass.1981) (upholding the President's authority to terminate claims of United States' Nationals against Iranian Entities); *with Behring International, Inc. v. G. William Miller, et al.*, No. 80–2864, memorandum opinion at 4 (D.N.J. March 3, 1981) (enforceability of Iranian Hostage Agreement as it affects the rights of United States Nationals is a question for judiciary; however, issue was mooted when Iranian defendant waived claim against disputed assets); *and Electronic Data Systems Corporation Iran v. The Social Security Organization of the Government of Iran, Et Al.*, 508 F.Supp. 1350 at 1358–1365 (N.D.Tex.1981) (preliminarily enjoining defendants from taking any action which might interfere with that court's jurisdiction).

■ We need not reach these questions in this case however, since the executive has concluded that the Iranian Hostage Agreement does not apply to cases involving standby letters of credit. The President clearly has the authority to interpret international agreements entered in the conduct of the nation's foreign affairs. *See* Restatement (Second) of Foreign Relations Law of the United States, § 149 (1965). Courts give great weight to the executive's interpretation of such agreements. *See Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); Restatement

(Second) of Foreign Relations Law, § 152. Here the Executive branch has interpreted the Iranian Hostage Agreement by way of regulations authorized by the President in the exercise of his authority under the International Emergency Economic Power Act, 50 U.S.C. § 1704. Such Regulations have the force and effect of law in United States courts. *Maryland Casualty Co. v. United States*, 251 U.S. 342, 349, 40 S.Ct. 155, 157, 64 L.Ed. 297 (1920). As indicated *supra*, at 1345–1346, the Treasury Department recently issued a series of additions and modifications to the Iranian Asset Control Regulations, 31 C.F.R. Part 535; 46 Fed.Reg. 14330, *et seq.* (February 26, 1981). Those Regulations expressly provide that the Executive Orders terminating litigation between United States Nationals and Iranian entities *do not apply* to claims "concerning the validity or payment of a standby letter of credit, performance or payment bond or other similar instrument." 31 C.F.R. § 535.222; 46 Fed.Reg. at 14335.

■ In spite of this rather clear and, we believe, correct interpretation of the Iranian Hostage Agreement and subsequent Executive Orders, Bank Melli contends that the precise treatment of standby letters of credit is subject to dispute and therefore should be referred to the International Arbitral Tribunal, pursuant to a provision in Declaration II to the effect that questions concerning the interpretation of the agreement may be referred to the Tribunal by either the United States or Iran. Declaration II, Article VI, at ¶ 4. At oral argument counsel for Bank Melli suggested that any other course might constitute a violation of the Iranian Hostage Agreement. We believe that Bank Melli lacks standing to assert this argument in the present litigation. The United States, the appropriate party to raise such an issue if it were indeed relevant, has taken the position that United States courts are free to adjudicate claims not subject to the international arbitration mechanism, *see* n. 14 *supra*, a position with which we agree.

■ Finally, Bank Melli argues that we should grant a continuance because Itek

would not be prejudiced by a failure to rule on its application for a preliminary injunction. In support of this contention, defendant asserts that the fact that Itek has previously established a "blocked account" pursuant to section 535.568 would preclude FNB from making any payments on the letters of credit at issue, regardless of whether this Court enjoins such payment, and, in any event, defendants have agreed to extend the temporary restraining order presently in effect.

As to the first point, the fact that Itek may have established a blocked account on *its* books pursuant to the Iranian Asset Control Regulations, *supra* at 1344 and n. 7, in no way affects either FNB's obligation, or ability, to honor a demand upon letters of credit issued by it absent a court order preventing it from doing so.[15]

As to defendants' offer to agree to a continuation of the temporary restraining order, we note first that a restraining order in one form or another has been in effect throughout the fourteen month pendency of this litigation, far in excess of the time period contemplated by the federal rules. *See* Fed.R.Civ.P. 65(b); 11 Wright & Miller, *Federal Practice and Procedure: Civil*, §§ 2951, 2953 (1973) (purpose of restraining order is to preserve the status quo until the parties are given an opportunity to be heard on application for preliminary injunction). Under these circumstances, we believe the burden is properly on the defendants to demonstrate that they would be prejudiced by a ruling on plaintiff's motion for a preliminary injunction. In view of the fact that defendants are free to appeal an adverse ruling under 28 U.S.C. § 1292(a)(1), or request modification or dissolution of any injunction upon a showing of hardship or changed circumstances, Wright & Miller, *supra*, § 2961 at 598–602, we see no reason why we ought not to rule on plaintiff's motion at this time. Accord-

ingly, Bank Melli's motion for a continuance is denied.

## ITEK'S MOTION FOR A PRELIMINARY INJUNCTION

■ In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that a plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Massachusetts, et al. v. Francis X. Bellotti, Et Al.*, 641 F.2d 1006 at 1009 (1st Cir. 1981). *See also Interco, Incorporated v. The First National Bank of Boston*, 560 F.2d 480, 484 (1st Cir. 1977).

### IRREPARABLE INJURY

In letter of credit cases the question whether the plaintiff is likely to suffer irreparable injury absent an injunction boils down to whether it has an adequate remedy at law. *Interco, supra*, 560 F.2d at 484; *United Technologies Corporation v. Citibank, N.A.*, 469 F.Supp. 473, 481 (S.D.N.Y. 1979). FNB contends Itek has an adequate remedy in this instance, since any damages resulting from FNB's wrongful honor of Bank Melli's demand can be reasonably calculated.

However, FNB's argument misses the mark. The fact that its damages may be reasonably calculable will provide Itek with little consolation in the event those damages ultimately prove uncollectible. Assuming FNB were permitted to honor the demand and make payment on the letters of credit at issue here, FNB can avoid liability to Itek upon a showing that Bank Melli's demand, *on its face*, conformed with the

15. Defendant's argument on this point appears directly contrary to its earlier position with respect to the effect of the Iranian Hostage Agreement upon blocked accounts. Opposition of Defendant Bank Melli Iran to Plaintiff's Application for a Temporary Restraining Order, at

8–9, (January 23, 1981). There defendant argued that President Carter's Executive Orders issued January 19, 1981 vacated all licenses creating blocked accounts and directed that *all* Iranian funds (including, we assume, those at issue here) be transferred.

terms of the letters. *See* M.G.L.A. c. 106, § 5–114(2)(b) and Comment 2.[16] The Bank's own contract with Itek expressly exempts it from liability for actions taken by it in good faith in connection with the letters of credit. Farnell Affidavit, (filed January 9, 1980), Exs. C–1, D–1, E–1, at ¶ 11.

Thus, if FNB were to make payment on the letters as demanded, Itek's only recourse would be a lawsuit against the Iranian Government.[17] On the present record, we do not believe that this can be considered an "adequate" remedy.[18] In reaching this conclusion, we take judicial notice of the fact that the present domestic situation there has rendered access to Iranian courts futile. *See American International Group, Inc. v. Islamic Republic of Iran*, 493 F.Supp. 522, 525 (D.D.C.1980); *Werner Lehara International, Inc. v. Harris Trust & Savings Bank*, 484 F.Supp. 65, 74 (W.D. Mich.1980); *Stromberg-Carlson Corp. v. Bank Melli Iran*, 467 F.Supp. 530, 532–33 (S.D.N.Y.1979).

■ The New York Law Revision Committee, which originally proposed the Uniform Commercial Code (U.C.C.) provisions governing letters of credit has taken the position that a party's legal remedies are inadequate where, as a practical matter, local government measures render litigation in a foreign forum valueless. 3 New York Law Revision Commission, *Study of the Uniform Commercial Code*, at 1656–57 (1955); *Accord* Restatement (Second) of Foreign Relations Law § 208.

FNB's reliance upon *KMW International v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 14 (2d Cir. 1979) to support its argument that Itek's legal remedies are adequate is misplaced. In *KMW*, the Second Circuit reversed the district court's issuance of a preliminary injunction against payments on letters of credit issued by Chase Manhattan in favor of an Iranian Bank, primarily on the ground that no demand for payment had been made at the time the injunction was requested. On the question of irreparable harm, the court stated:

> Appellant claims, however, that the financial damage which it may suffer is irreparable since it will have no real remedy, at least by way of resort to Iranian courts, if Chase were to pay a demand which appears to comply with the terms of credit but is in fact fraudulent. But this damage is purely conjectural. At the time the preliminary injunction was granted, Chase had received no demand for payment whatsoever; that a later demand would necessarily be fraudulent is at best speculative. "[I]njunctive relief can and should be predicated only on the basis of a showing that the alleged threats of irreparable harm are not remote or speculative but are actual and

---

**16.** Itek contends that Massachusetts law governs the rights and liabilities of all parties with respect to the letters of credit. *See Dynamics Corporation of America v. Citizens & Southern National Bank*, 356 F.Supp. 991, 997 (N.D.Ga. 1973). Since the letters in question expressly provide that they are governed by Massachusetts law (at ¶ 12) and neither defendant has objected to its application, we assume without deciding that Massachusetts law applies.

**17.** Contract No. 113 expressly provides that all disputes between the parties relative to the contract shall be settled by competent Iranian Courts. Farnell Affidavit, (March 11, 1980), Ex. A, Section 10. The Iranian Hostage Agreement, in turn, expressly excludes from the jurisdiction of the International Arbitral Tribunal claims arising from a contract specifically providing that any disputes arising under it shall be within the sole jurisdiction of the Iranian courts. Declaration II, Article II, at ¶ 1. Ac-

cordingly, plaintiff cannot be said to have an adequate legal remedy by virtue of any provisions of the Iranian Hostage Agreement.

**18.** Nor can Itek's quantum meruit action against Iran, presently pending before this court, *see* n. 10 *supra*, be considered an adequate legal remedy. The Executive Orders dissolving all attachments and ordering the transfer of all Iranian assets held in domestic books makes it a virtual certainty that Itek would be unable to satisfy any favorable judgment obtained in that case out of Iranian assets located in the United States. Itek would most likely be required to bring an action in an Iranian court to enforce the judgment. Thus, the conclusion appears inescapable that the adequacy of Itek's legal remedies is necessarily contingent upon its ability to sue in Iranian courts.

imminent." *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 755 (2d Cir. 1977). Since KMW's damages are financial in nature or, at best, of a speculative quality, a preliminary injunction should not have issued. 606 F.2d at 15. By contrast, Itek's allegations of irreparable harm in this case are not speculative, but are genuine and immediate. Bank Melli has formally demanded payment of the outstanding letters of credit. FNB has taken the position that the demand is conforming within the meaning of the U.C.C., M.G.L.A. c. 106, § 5–114. Under these circumstances, plaintiff has satisfied the irreparable injury component of the preliminary injunction standard.

## PROBABILITY OF SUCCESS

The U.C.C. specifically provides that a court may enjoin payment of a letter of credit where either the documents presented to the issuing bank are forged or fraudulent or there is fraud in the transaction. M.G.L.A. c. 106, § 5–114(2)(b). This section provides an important exception to the general rule that the parties' respective rights and liabilities on a letter of credit are independent of the underlying transaction. *KMW International*, 606 F.2d at 15; *American Bell International v. Islamic Republic of Iran*, 474 F.Supp. 420, 424 (S.D.N.Y.1979); *United Technologies, supra*, 469 F.Supp. at 477; *see generally* Note: *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution*, 93 Harv.L. Rev. 992, 994–95 (1980).

The need for this exception becomes apparent when one considers the function letters of credit are designed to perform in facilitating commercial transactions. Briefly, letters of credit, including "standby" letters intended to guarantee performance such as the ones involved in the instant case, are designed to insure that neither party to a contract enjoys the benefits of both his own and the other party's performance at the same time. In other words, letters of credit eliminate the need for one party to extend credit to the other. 93 Harv.L.Rev. at 1000. Where, however, a party by means of fraudulent conduct seeks to obtain the benefits of both performance and payment, the fundamental purpose underlying the letter of credit could be undermined unless injunctive relief were available. *Id.* at 1009.

In this case, the undisputed facts in the record indicate that Itek had substantially performed its obligations under Contract No. 113 prior to the cancellation of its export license in April, 1979. As indicated *supra,* at 1343, the value of Itek's performance far exceeded Iran's payments under the contract. After the export license was cancelled, Itek made several attempts to meet with the appropriate Iranian authorities in order to negotiate the parties' respective contractual obligations. When these attempts failed, Itek followed the procedure specified in the contract for cancellation, which should have resulted in the release of all guarantees and letters of credit. Under these circumstances, any demand on the guarantees or letters of credit by Iran in March, 1980 would necessarily have been fraudulent.[19]

In addition, Bank Melli is properly charged with actual knowledge of all the facts and circumstances culminating in its demand on the letters of credit, including the contractual provisions requiring release of all guarantees upon cancellation of Contract No. 113. Prior to the Iranian revolution, Bank Melli was wholly-owned by the Imperial Government. Following the revolution, all banks, including Bank Melli, were nationalized by the new Islamic Republic. *KMW International*, 606 F.2d at 17; *Werner Lehara, supra*, 484 F.Supp. at 74, n. 3. In addition, the record indicates that Bank

---

**19.** Because the Iranians' fraud is undisputed and appears so blatant in this case, we need not resolve several thorny issues which other courts have wrestled with in similar cases, such as the degree of wrongful conduct necessary to sustain a claim of fraud, and whether the term "transaction" as it is used in section 5–114(2)(b) encompasses the underlying contract or simply the letter of credit transaction. *See generally* Getz, *Enjoining the International Standby Letter of Credit: The Iranian Letter of Credit cases*, 21 Harv.Int'l.Law J. 189, 204–08 (1980).

Melli received FNB's March 12, 1980 telex advising it that Itek had cancelled Contract No. 113 and refused to extend the expiration dates of the letters of credit at issue, prior to demanding payment of the letters. Dahlen Affidavit (filed March 19, 1980), Exs. A and B. Under these circumstances, Bank Melli cannot be regarded as a holder in due course, within the meaning of M.G. L.A. c. 106, § 5–114(2)(a). *See United Technologies*, 469 F.Supp. at 478.

In short, plaintiff's factual allegations, if proven at trial, appear to make out a *prima facie* case of fraud within the meaning of section 5–114(2)(b). Accordingly, Itek has made a sufficiently strong showing of likely success on the merits to justify the issuance of a preliminary injunction.[20] *Accord Harris Corp. v. State of Iran*, No. 80–23–ORL–CIV–R (M.D.Fla. May 29, 1980) (preliminary injunction granted where demand on letters of credit was made after cancellation of underlying contract with Iranian entity due to occurrence of force majeure); *Dynamics Corporation of America v. Citizens and Southern National Bank*, 356 F.Supp. 991 (N.D.Ga.1973).

## BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST

The potential injury to Itek in the event preliminary relief is denied has been discussed *supra* in connection with our analysis of the adequacy of legal remedies. Before an injunction may issue, this harm must be found to outweigh the potential harm to the defendants from the issuance of the injunction, and the public interest must not be adversely affected.

FNB cites *KMW International*, 606 F.2d at 17, for the proposition that the issuance of an injunction against payment of letters of credit may damage the reputation of the issuing bank. In addition, several courts have indicated that by enjoining the payment of letters of credit, courts impair the value of these instruments, particularly in

international transactions. *See e. g., Cappaert Enterprises v. Citizens & Southern International Bank of New Orleans*, 486 F.Supp. 819, 831 (E.D.La.1980).

We frankly cannot agree that either of these considerations justifies the denial of preliminary relief in this instance. Where, as here, the governing statute specifically authorizes injunctive relief upon proof of certain facts, and the plaintiff's uncontroverted pleadings and affidavits demonstrate a likelihood of proving those facts, we fail to see how the issuance of preliminary relief in order to avoid irreparable harm in any way impugns the integrity of the issuing bank or the usefulness of letters of credit in facilitating international transactions. On the contrary, the failure to issue an injunction where otherwise appropriate would send a clear signal to those inclined to engage in fraudulent activities that they are likely to be rewarded. We believe such a result would have an even greater adverse impact upon issuing banks, and ultimately discourage the use of letters of credit. In any event, we agree with the conclusion drawn by the court in *Dynamics Corporation, supra*, 356 F.Supp. at 1000, that there is at least as much public interest in discouraging fraud as in encouraging the use of letters of credit.

Apart from these theoretical concerns, we cannot disregard the fact that, as a practical matter, FNB has been restrained from making any payments on the letters of credit for nearly fourteen months. In that time, neither defendant has demonstrated any specific prejudice resulting from FNB's failure to honor Bank Melli's demand. *Cf. American Bell International v. Islamic Republic of Iran, supra*, 474 F.Supp. at 426 (preliminary injunction denied where, *inter alia*, issuing bank demonstrated strong likelihood of retaliation against substantial assets owned by it in Iran). Indeed, the fact that FNB recently agreed to several exten-

**20.** Because of our ruling on the fraud issue, we need not consider a wholly independent ground relied upon by Itek to justify preliminary relief, i. e., that Bank Melli's demand failed to conform to the requirements of the letters of credit. Significantly, FNB's opposition to Itek's re-

quest for an injunction addresses only this second ground. FNB does not contend that fraud is an insufficient basis for injunctive relief. Nor does it contest the fact that Itek has demonstrated a likelihood of success in proving fraud.

sions of the temporary restraining order presently in effect strongly suggests that any such prejudice has been minimal. *Dynamics Corporation*, 356 F.Supp. at 1000 (where beneficiary waited a year before exercising its rights under letter of credit, additional delay and issuance of preliminary injunction did not appear to impose particular hardship).

Under these circumstances, we believe any injury to the bank from our issuance of a preliminary injunction is outweighed by the potential harm to Itek were we to allow FNB to honor Bank Melli's demand for payment, and the public interest will not be adversely affected by the issuance of an injunction.

### PRELIMINARY INJUNCTION

Having considered the briefs, affidavits on file, and arguments of counsel, the Court finds that plaintiff is likely to suffer irreparable harm if an injunction is not granted. The Court further finds that plaintiff has demonstrated a substantial likelihood of success on the merits; the balance of hardships weighs more heavily in plaintiff's favor; and the public interest would not be adversely affected by the issuance of an injunction. Accordingly, plaintiff's motion for a preliminary injunction is hereby granted.

Defendant The First National Bank of Boston and all persons acting in concert with it are enjoined from honoring any demand for payment or making any payment under letters of credit bearing the serial numbers S–14555, S–14558, and S–14559, until further order of this Court. The requirement of bond is waived.

SO ORDERED.