ITEK CORPORATION, Plaintiff,

v.

The FIRST NATIONAL BANK OF BOSTON, et al., Defendants.

Civ. A. No. 80–58–MA.

United States District Court, D. Massachusetts.

June 28, 1983.

Thomas D. Edwards, Andrew M. Higgins, Stephen M. Perry, Casner, Edwards & Roseman, Boston, Mass., for plaintiff.

Rory Fitzpatrick, Thomas H. Walsh, Jr., Susan E. Garsh, Bingham, Dana & Gould, Boston, Mass., Daniel P. Levitt, Greg A. Danilow, Alan R. Friedman, Kramer, Levin, Nessen, Kamin & Frankel, New York City, William Zucker, Gadsby & Hannah, Boston, Mass., for defendants.

## OPINION

MAZZONE, District Judge.

This matter arises from an extended and complex suit brought by the plaintiff Itek Corporation (Itek) against the defendants First National Bank of Boston (FNBB) and Bank Melli Iran (Bank Melli) challenging the validity of certain letters of credit issued by FNBB in favor of Bank Melli. It is before the Court on the plaintiff's motion for preliminary injunction.

*Procedural and Factual Background*

The parties are thoroughly familiar with the background and earlier proceedings in this action, which may be summarized as follows.[1]

The plaintiff is a corporation organized under the laws of the state of Delaware, with its principal place of business in Lexington, Massachusetts. The defendant FNBB is a national banking association organized under the laws of the United States, with its principal place of business in Boston, Massachusetts. The defendant Bank Melli is an agent or instrumentality of the government of Iran.

In April of 1977, Itek entered into a contract with the Imperial Government of Iran to manufacture certain high-technology optical equipment. The contract price was $22,500,000. By the terms of this contract, the Imperial Government was required to make an advance payment to Itek of $4,500,000. Itek, in turn, was obliged to provide security for this advance in the form of four bank guaranties, each in the amount of $1,125,000, issued by Bank Melli and naming the Imperial Ministry of War as beneficiary. Itek was further required to furnish a bank guaranty in the amount of $2,250,000, issued by Bank Melli in favor of the Imperial Ministry of War as security for the good performance of its contractual obligations.

As a condition to issuing the guaranties, Bank Melli required Itek to supply standby letters of credit in its favor, issued by an American bank, with amounts and terms paralleling those of its own guaranties. Itek complied with this condition by providing five letters of credit issued by FNBB and naming Bank Melli as beneficiary. Each of these standby letters of credit stated that payment would be conditioned on receipt of an authenticated cable stating that Bank Melli had been required to make payment under its corresponding guaranty

to the Imperial Ministry of War and that it was airmailing to FNBB a signed statement to that effect.

Of the five original letters of credit issued by FNBB, three remained outstanding as of January 1980, when this suit was brought. These are S–14555, issued and outstanding in the amount of $2,250,000; S–14558, issued in the amount of $1,125,000 and outstanding in the amount of $70,753; and S–14559, issued and outstanding in the amount of $1,125,000.

The contract between Itek and the Imperial Government of Iran provided that in the event of *force majeure,* including the cancellation of Itek's export license covering the equipment, either party would be entitled to inform the other of the event constituting *force majeure* and, after three months, to cancel the contract by written notice. Upon cancellation, the parties would clear their account and release all guaranties and letters of credit.

From April of 1977 through the end of 1978, work on the contract apparently proceeded without incident. An independent American company monitored the progress of the work performed by Itek and gave Itek consistently high praise for its efforts. By February 10, 1979, the value of Itek's performance amounted to $20,300,000; and payments to Itek totalled $11,100,000.

In early 1979, Iran underwent a revolution. Ultimately, the head of the Imperial Government, Shah Riza Pahlevi, was driven into exile, and was succeeded in power by the Moslem religious leader Ayatollah Ruhollah Khomeini. The Islamic Republic of Iran was established, and the Imperial Ministry of War was replaced by the Ministry of National Defense.

On April 30, 1979, the State Department cancelled the export license for the equipment to be manufactured by Itek under the contract. Two weeks later, on May 15, 1979, Itek notified the Iranian authorities

---

**1.** Discussions of the procedural and factual history of this matter are also set forth in two earlier opinions of this Court, *Itek Corporation v. First National Bank of Boston,* 511 F.Supp. 1341 (D.Mass.1981), and *Itek Corporation v.*

*First National Bank of Boston,* Slip Opinion (D.Mass. May 25, 1982); as well as in an opinion of the Court of Appeals, *Itek Corporation v. First National Bank of Boston,* 704 F.2d 1 (1st Cir.1983).

of the occurrence of *force majeure,* and requested consultations in accordance with the terms of the contract.

On August 20, 1979, representatives of Itek met in Iran with officials of the Ministry of National Defense to discuss the occurrence of *force majeure* and the status of the contract obligations. At this meeting, Itek's representatives also presented the Iranian participants with copies of unpaid invoices that had accumulated since February 1979, and a summary of the account under the contract.

On November 3, 1979, the United States Embassy in Teheran, Iran was forcibly taken over and 52 American citizens were taken hostage. In response to the crisis, President Carter on November 14, 1979 declared a national emergency and, by Executive Order No. 12170, "blocked" all Iranian assets subject to the jurisdiction of the United States.

Shortly thereafter, the Treasury Department promulgated regulations to implement the Presidential directive that all assets be blocked. These regulations prohibited the transfer of any property subject to the jurisdiction of the United States in which Iran had any interest whatever, except as authorized by license or regulation. 31 C.F.R. §§ 535.101 *et seq.* The regulations specifically authorized payment by United States banks on letters of credit issued in favor of an Iranian entity, provided the payments were made into blocked accounts in domestic banks. At the same time, nothing in the regulations "preclude[d] any person for whose account a standby letter of credit was opened or any other person from contesting the legality of the demand from the Iranian entity or from raising any other legal defense to payment." 31 C.F.R. § 535.568(e).

On December 6, 1979, Itek sent the Ministry of National Defense further written notice advising of the occurrence of *force majeure,* and again requesting consultations. No response was received to this communication. This action was commenced on January 9, 1980.

Itek has alleged in its complaint and supporting affidavits that prevailing circumstances in Iran created a serious risk that unwarranted and fraudulent demands would be made upon the letters of credit then outstanding with FNBB. Itek sought temporary and permanent relief in the form of an order enjoining FNBB from honoring any demand on the letters of credit without first giving Itek five days notice. On January 9, 1980, this Court entered a temporary restraining order requiring three days notice prior to payment, and after hearing on January 18, 1980, a preliminary injunction was entered to the same effect.

In February and March of 1980, Bank Melli requested extension of two of the outstanding letters of credit. In the alternative, Bank Melli requested immediate payment in full. Itek directed FNBB to refuse both the requests for extension and payment, on grounds that the contract had been cancelled and the letters of credit securing the advance payment had been cleared.

On March 11, 1980, Itek amended its complaint to seek an injunction restraining FNBB from making any payment on the letters of credit. That same day, a temporary restraining order was entered preventing FNBB from honoring any demand on letters of credit S–14555, S–14558 and S–14559. That order was extended, without opposition, on March 20 and 28, 1980.

On March 16, 1980, FNBB · received a formal demand of payment on the three outstanding letters of credit from Bank Melli. The plaintiff amended its complaint to add Bank Melli as a defendant on March 19, 1980.

On April 10, 1980, Bank Melli moved for a stay of proceedings pending action by the Judicial Panel for Multidistrict Litigation. The United States government filed Suggestions of Interest supporting the motion as necessary to important national interests. The motion for a stay was granted on April 14, 1980, and the temporary restraining order entered on March 11, 1980 was extended until further order of the Court.

On January 19, 1981, agreement was reached between the United States and Iran to release the 52 American hostages. As part of the agreement, the United States consented to transfer all blocked Iranian assets from the Federal Reserve Bank of New York to an escrow account to be established at the Bank of England, and to submit to arbitration by an International Arbitral Tribunal claims of United States or Iranian nationals against the other government. The United States further agreed to terminate litigation in United States courts involving claims subject to arbitration before this tribunal.

The agreement was implemented by a complex series of Executive Orders and regulations. As I have noted, Executive Order No. 12170 blocked the transfer of all Iranian assets subject to the jurisdiction of the United States. On February 24, 1981, Executive Order No. 12294 was issued, suspending in the American courts "all claims which may be presented to the Iran-United States Claims Tribunal." Specifically excluded from this order was "any claim concerning the validity or payment of a standby letter of credit." The Treasury Department promulgated regulations to implement this order, suspending all claims eligible for arbitration before the Tribunal, and specifically excluding claims concerning the validity or payment of standby letters of credit. 31 C.F.R. § 535.222. Section 535.504, which had barred entry of final judgment in any matter affecting interests in blocked assets, was amended to allow entry of final judgment in matters not suspended by section 535.222.

On January 23, 1981, Itek again sought entry of final judgment declaring the letters of credit null and void. Bank Melli opposed the motion and sought a continuance, on grounds that the agreement between the United States and Iran suspended all matters pending in the United States courts. Finding that the Executive's interpretation of international agreements was binding upon the courts, I held that under existing Executive Orders and Treasury Regulations, Itek was entitled to a preliminary injunction preventing FNBB from honoring any demand for payment on the letters of credit. That injunction was issued, and Bank Melli's motion for continuance was denied, on April 10, 1981.

On January 13, 1982, Itek moved for entry of default judgment against Bank Melli, or in the alternative, summary judgment against Bank Melli and FNBB. At this juncture, there being no obstacle to entry of a final judgment, this Court considered and ruled on the merits of each of the plaintiff's claims. Specifically, I found that jurisdiction, venue, and service of process were all proper; and that the Ministry of National Defense was not an indispensible party. I further found that the demands made by Bank Melli on all three letters of credit were non-conforming, that they were received after the expiration dates, that there was fraud in the transaction, and that the letters of credit were therefore without any legal force, and were null and void. A Memorandum and Order was entered to this effect on May 25, 1982, and judgment was entered on June 1, 1982.

FNBB moved pursuant to Fed.R.Civ.P. 59(e) to alter or amend the judgment, which motion was denied. FNBB then filed a notice of appeal from the judgment, and from the denial of its motion to alter or amend. Bank Melli also appealed from the memorandum, order and judgment.

Two further amendments were made by the Department of Treasury to the regulations governing disposition of Iranian assets prior to argument before the Court of Appeals. On July 2, 1982, the Treasury Department amended section 535.504 to prevent the entry of final judgments concerning Iranian interests in standby letters of credit. As a result, claims concerning the validity of standby letters of credit became subject to the general licensing provisions of 31 C.F.R. § 535.504.

On December 7, 1982, just two days before argument in the Court of Appeals, the regulations were again amended to prevent the entry of final judgment in cases where "judgments or orders . . . may have been previously entered but [have] not become final by July 2, 1982, through the conclusion

of appellate proceedings or the expiration of the time of appeal." This case was cited by the Secretary of the Treasury as an example of a case pending on appeal to which the amended regulation should apply.

Both of these amendments were adopted in order to permit the United States and Iran to attempt to resolve a disagreement as to whether disputes concerning the validity of standby letters of credit were to be submitted to the International Arbitral Tribunal. They represent the judgment of the Secretary of the Treasury and of the Executive branch that a temporary ban on final judgments regarding those claims was required in order to provide an opportunity for further negotiations between the two governments.

The Court of Appeals, in its opinion in this matter issued on March 29, 1983, made a number of findings with respect to the validity of the judgment of the District Court and of the regulations issued by the Secretary of the Treasury. The Court of Appeals noted that it was "constrained to apply the law as it exists now, not as it existed when the district court rendered its judgment." *Itek Corporation v. First National Bank of Boston,* 704 F.2d 1, 6 (1st Cir.1983).

The Court considered and rejected an argument made by Itek that the regulation as amended unconstitutionally constricted the jurisdiction of the federal courts, on grounds that the regulation "does not purport to suspend entirely judicial activity regarding claims on standby letters of credit." *Id.* at 10. The Court stated:

> Courts may continue to hear cases regarding standby letters of credit and may issue temporary relief, including injunctions against payment on the letters of credit. The regulation merely forbids final judgments extinguishing Iranian interests in standby letters of credit and presumes, for purposes of that regulation, that a prior beneficial Iranian interest remains valid.

*Id.*

The Court of Appeals vacated the final judgment and order of this Court, and indicated that:

> Since there is no barrier to the court's issuing preliminary relief, the district court is free, on remand, to reinstate its preliminary injunction barring FNBB from making any payments on the standby letters of credit until such time as the court is free to render a final judgment on the validity of Bank Melli's demands on the letters of credit or the dispute is suspended in the courts and submitted to the Tribunal for resolution.

*Id.* at 11.

### Motion for Preliminary Injunction

Against this elaborate procedural and factual background, I now must consider the merits of the plaintiff's motion before this Court. Itek has moved for reinstatement of a preliminary injunction preventing FNBB and all persons acting in concert with it from honoring any demand for payment or making any payment on letters of credit S-14555, S-14558, and S-14559.

■ The purpose of a preliminary injunction generally is to protect the rights of the parties and to preserve the *status quo* between the parties pending a full hearing on the merits of their controversy. In determining whether a preliminary injunction should issue, the Court must consider four factors. These are whether the plaintiff will suffer irreparable injury if the injunction is not granted; whether such injury outweighs any harm which granting the relief would inflict on the defendants; whether the plaintiff has demonstrated a sufficient likelihood of success on the merits; and whether the public interest will be adversely affected by granting the requested relief. *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). I shall consider these factors in order.

### Irreparability of Harm

First, I must determine whether the plaintiff will suffer irreparable injury if the requested relief does not issue. Itek, on the one hand, has argued that it will suffer

**1216**

irreparable harm if its motion is not granted on grounds that it has no adequate remedy at law. Bank Melli, on the other, has argued that money damages, available to Itek at the International Arbitral Tribunal or in the Iranian courts, would be sufficient to make Itek whole.

◼ In commercial litigation, the question whether the plaintiff is likely to suffer irreparable injury may be cast in terms of whether the plaintiff has available a legal remedy adequate to compensate it for its injuries. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Though I accept that Itek's ultimate damages, absent an injunction, are susceptible to reasonable estimation, I do not find that this alone establishes an adequate remedy at law. As I stated in an earlier opinion in this matter, "[t]he fact that its damages may be reasonably calculable will provide Itek with little consolation in the event those damages ultimately prove uncollectable." *Itek Corporation v. First National Bank of Boston,* 511 F.Supp. 1341, 1348 (D.Mass.1981). Nothing has occurred to change my view that "if [FNBB] were to make payment on the letters as demanded, Itek's only recourse would be a lawsuit against the Iranian Government," 511 F.Supp. at 1349, or that on the present record, this cannot be viewed as an "adequate" remedy. *Id.*

Bank Melli has further argued that if Itek is presently without a legal remedy, it is the result of Itek's own lack of diligence. Bank Melli argues, correctly, that the government of Iran bargained for and Itek agreed to a contract including a term that disputes would be resolved in the Iranian courts. Bank Melli further argues that even if Itek should be relieved of its contractual obligation to litigate in Iran, it nevertheless should be required to submit its grievance to the International Arbitral Tribunal. I decline to accept either of these arguments, for several reasons.

◼ First, as to the claim that the government of Iran is entitled to the benefit of its bargain struck in 1977, I acknowledge that at that time, "Itek willingly and knowingly accept this *customary arrangement* as a *necessary condition* of obtaining the contract." Brief of Bank Melli, at 12 (emphasis supplied). At risk of stating the obvious, I take judicial notice of the fact that conditions in Iran have changed radically since that time. What was contractually "customary" and "necessary" in 1977 does not, in the face of dramatically changed circumstances, exert binding force on the parties and this Court more than six years later. I reiterate my earlier finding, that "the present domestic situation there has rendered access to Iranian courts futile." *Itek Corporation v. First National Bank of Boston, supra,* 511 F.Supp. at 1349. Therefore, I do not find that Itek should be required to pursue its remedies in the Iranian courts before having resort to this forum. *See* 3 New York Law Revision Commission, *Study of the Uniform Commercial Code,* at 1656–57 (1955).

◼ Second, as to Bank Melli's claim that Itek should be estopped from pursuing remedies in this Court because of its failure to pursue arbitration before the International Arbitral Tribunal, I find that Itek's election not to avail itself of arbitration has been consistent with the United States' interpretation of the agreement between the United States and Iran, as stated in the several Executive Orders and Treasury Regulations discussed above. The precise question posed by this issue, that is, whether disputes regarding standby letters of credit are to be suspended in the United States courts and submitted to the tribunal, is presently a matter of disagreement and is the subject of ongoing discussions between the governments of the United States and Iran. Until it is resolved, Itek cannot be expected to conform its conduct to any other standard than that articulated by the orders and regulations of the United States government. Indeed, Itek would have been acting in a manner inconsistent with express Presidential and Treasury Department directives had it brought this dispute to arbitration before the tribunal. Therefore, I do not find that Itek should have

been required to pursue its remedies before the International Arbitral Tribunal.

Because I find that Itek has demonstrated that it has no adequate remedy at law, and because I find that the allegations of irreparable harm are not speculative, but genuine and immediate, I am satisfied that Itek will suffer irreparable harm if the requested relief is not granted.

### Balance of Injury

Second, I must consider whether the injury to the plaintiff outweighs the harm which granting the requested relief would inflict on the defendants. I accept the representations of the defendant FNBB that granting an injunction against payment of letters of credit may damage the reputation of the issuing bank. I further accept the argument, advanced by both FNBB and Bank Melli, that by enjoining payment of letters of credit, courts may impair the utility of these devices in international business transactions. However, I cannot agree that either of these considerations justifies the denial of preliminary relief in this matter.

In an earlier opinion in this matter, I found:

> [T]he issuance of preliminary relief in order to avoid irreparable harm [does not] in any way impugn[ ] the integrity of the issuing bank or the usefulness of letters of credit in facilitating international transactions. On the contrary, the failure to issue an injunction where otherwise appropriate would send a clear signal to those inclined to engage in fraudulent activities that they are likely to be rewarded. We believe such a result would have an even greater adverse impact upon issuing banks, and ultimately discourage the use of letters of credit.

*Itek Corporation v. First National Bank of Boston, supra,* 511 F.Supp. at 1351. Under these circumstances, I believe that any injury to the defendants from the issuance of a preliminary injunction is outweighed by the potential harm to Itek were relief to be denied.

### Likelihood of Success on the Merits

I next consider whether the plaintiff has demonstrated a sufficient likelihood of success on the merits of its claims to warrant preliminary relief at this time.

The Uniform Commercial Code, M.G.L. c. 106, specifically provides that a court may enjoin payment of a letter of credit where either the documents presented to the issuing bank are forged or fraudulent or there is fraud in the underlying transaction. M.G.L. c. 106 § 5–114(2)(b). This provision carves out an important exception to the general rule that the parties' respective rights and liabilities on a letter of credit are independent of the underlying transaction. *See, generally,* Note, "Fraud in the Transaction: Enjoining Letters of Credit During the Iranian Revolution," 93 Harv.L.Rev. 992, 994–95 (1980).

As I have earlier found in this matter, the uncontested facts in the record, if proven at trial, appear to make out a *prima facie* case of fraud within the meaning of section 5–114(2)(b):

> Itek had substantially performed its obligations under [the contract] prior to the cancellation of its export license in April, 1979 ... [and] the value of Itek's performance far exceeded Iran's payments under the contract. After the export license was cancelled, Itek made several attempts to meet with the appropriate Iranian authorities in order to negotiate the parties' respective contractual obligations. When these attempts failed, Itek followed the procedure specified in the contract for cancellation, which should have resulted in the release of all guarantees and letters of credit. Under these circumstances, any demand on the guarantees or letters of credit by Iran in March, 1980 would necessarily have been fraudulent.

*Itek Corporation v. First National Bank of Boston, supra,* 511 F.Supp. at 1350.

■ Bank Melli has argued that Itek was never in a position to cancel for *force majeure* pursuant to the contract because its export license was merely suspended and not renewed, and not cancelled, as required

by the express terms of the contract. I find that even if Bank Melli could succeed in identifying a distinction between suspension without renewal and cancellation, and I do not believe it has, it would have identified a distinction without a difference. In the context of the events in Iran at the time of the indefinite suspension of Itek's export license, I find that that suspension was equivalent to a constructive cancellation of the license, and formed a sufficient basis for invocation of *force majeure.*

On the basis of the above, I find that Itek's uncontroverted factual allegations establish a sufficient likelihood of success on the merits of its claim that there was fraud in the transaction, within the meaning of section 5–114(2)(b) of the Uniform Commercial Code, to warrant issuance of preliminary relief at this time.[2]

*The Public Interest*

Finally, I must consider whether the public interest will be harmed by granting the requested relief. For a number of reasons, I find that the public interest will not be adversely affected.

First, I find that the public interest is not disserved by delaying or preventing the consummation of a transaction that may be infected by fraud. As I have noted above, despite the admitted public interest in the integrity of financial institutions, and specifically in the ability of those institutions to perform their claimed contractual obligations, I find that "there is at least as much public interest in discouraging fraud as in encouraging the use of letters of credit." *Itek Corporation v. First National Bank of Boston, supra,* 511 F.Supp. at 1351.

Second, I find that the public interest is aided by the court's effective use of its limited power of intervention to maintain regularity in these important commercial transactions.

Finally, and most significantly, I find that the public interest would be manifestly disregarded were this Court to ignore the plain intent of the Executive branch in issuing its most recent amendments to the Treasury Regulations on the status of standby letter of credit litigation. The purpose of these amendments is to halt proceedings in the United States courts, in order that diplomatic negotiations as to the proper forum for these claims may proceed unimpeded. In the absence of this injunction, the controversy underlying these discussions, at least with respect to these parties, might become moot.

I therefore find that the public interest is not harmed by granting the requested relief.

*Conclusion*

■ Having considered all the arguments raised by the plaintiff and defendants in their briefs, affidavits and pleadings, I find that the plaintiff has demonstrated that it is likely to suffer irreparable harm if an injunction does not issue, that such injury outweighs any harm to be inflicted upon the defendants, that the plaintiff has demonstrated a sufficient likelihood of success on the merits, and that the public interest will not be adversely affected by the granting of the requested relief. Accordingly, the plaintiff's motion for a preliminary injunction is hereby granted.

The defendant First National Bank of Boston and all persons acting in concert with it are hereby enjoined from honoring any demand for payment or making any payment on letters of credit bearing the

2. In an earlier opinion in this matter, *Itek Corporation v. First National Bank of Boston,* Slip Opinion (D.Mass. May 25, 1982), I rendered a declaratory judgment to the effect that the demands made on the three letters of credit by Bank Melli were accompanied by fraud in the transaction; and further, that no conforming demand was made by Bank Melli prior to the expiration date of the letters, and that each of the letters had expired. At that time, the mat-ter was before the Court for final adjudication, and so I deemed it necessary to address each of the several claims raised by Itek. Here, however, this Court has been expressly prohibited from entering a final judgment, and so I have confined my analysis of likelihood of success on the merits to that claim for which I find proof has been most clearly adduced at this preliminary stage, that is, the presence of fraud in the transaction.

serial numbers S–14555, S–14558, and S–14559, until further order of this Court. The requirement of bond is waived.

SO ORDERED.