**ITEK CORPORATION, Plaintiff, Appellee,**

v.

**The FIRST NATIONAL BANK OF BOSTON, Defendant, Appellee.**

**Bank Melli Iran, Defendant, Appellant.**

**No. 83–1594.**

United States Court of Appeals, First Circuit.

Argued Dec. 9, 1983.

Decided March 22, 1984.

Greg A. Danilow, with whom Daniel P. Levitt, Alan R. Friedman, Michael B. Reuben, Kramer, Levin, Nessen, Kamin & Frankel, New York City, William A. Zucker, and Gadsby & Hannah, Boston, Mass., were on brief, for Bank Melli Iran.

Thomas D. Edwards, Boston, Mass., with whom Andrew M. Higgins, Stephen M. Perry, and Casner, Edwards & Roseman, Boston, Mass., were on brief, for Itek Corp.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The First National Bank of Boston ("FNBB"), at the request of Itek Corp., issued several letters of credit running in favor of Bank Melli Iran ("Melli"). Melli demanded payment from FNBB of the money that the letters promised. Itek obtained a federal district court injunction (*see* 12 U.S.C. § 632) prohibiting FNBB from paying Melli, 566 F.Supp. 1210. Melli, the true party in interest, appeals. The basic question that Melli's appeal presents is whether its effort to obtain the money by calling the letters is "fraudulent." We find the district court's affirmative answer to this question adequately supported. And we therefore affirm its decision to issue the injunction.

I

The following, somewhat simplified, account provides the necessary factual background:

a. *The basic contract.* The letters of credit arise out of promises made in a 1977 contract between Itek and Iran's Imperial Ministry of War. The contract provided that Itek would make and sell high-technology optical equipment to the War Ministry at a price of $22.5 million. Iran was to make a twenty percent down payment ($4.5 million). It would pay Itek sixty percent of the total price ($13.5 million) as work progressed; it would pay the remaining forty percent upon satisfactory completion. The down payment amount would be deducted gradually from the payments due under Itek's "work-in-progress" invoices. *See* Contract, Appendix 3, ¶¶ 1.1, 1.4.

b. *The contract's bank guarantees.* The contract required Itek to provide two types of bank guarantees. The first, the "down payment" guarantee, was for $4.5 million, the amount of the down payment. Its object apparently was to give the Ministry the right to obtain return of the down payment (or portions of the down payment) until Itek produced work of sufficient value to have "earned" the down payment. The second, the "good performance" guarantee was for $2.25 million, ten percent of the contract price. Its object was to protect the Ministry against a breach of contract as might occur, for example, if the goods produced were defective. These guarantees were to be issued in favor of the Ministry by an approved Iranian bank. The Ministry could call for payment under the guarantees simply by submitting a written request for payment to the bank.

Bank Melli, an instrumentality of the Iranian government, issued the guarantees in the form of five "guarantee letters." One letter was for $2.25 million; it backed "good performance." The other four letters were each for $1.125 million; they backed the down payment. Melli, as a condition for issuing them, required Itek to provide it with five similar "standby" letters of credit, issued by an American bank

in Melli's favor, and payable on Melli's certification that the Ministry had required it to pay under its letters to the Ministry. The "standby" letters are the FNBB letters at issue here.

c. *The contract's procedures for cancelling the guarantees.* The contract contains specified procedures and conditions governing the termination of the guarantees. It states that the Ministry is to release "down payment" guarantees "within 4 weeks after the clearance of down-payments amount." Contract ¶ 9.5. It states that the Ministry is to release the "good performance" guarantee four weeks after its final acceptance of the goods.

The contract provided for another circumstance, directly relevant here, under which the Ministry was to release the "good performance" guarantee. If the contract "is cancelled due to Force Majeure ..., all Bank Guarantees of good performance of work will be immediately released." Contract ¶ 9.4. The contract defines "Force Majeure" to include cancellation by the United States of necessary export licenses. If force majeure occurs—if, for example, there is a war or a natural disaster, or if the United States cancels the export license—either party can cancel the contract. A party can cancel the contract on this basis, however, only if it has notified the other party of the occurrence of force majeure, the parties have been unable to agree to some resolution of the force majeure difficulty, and three months have passed since notification. The contract also stipulates that, if force majeure leads to cancellation of the contract, Itek will be paid for equipment shipped, for equipment then being manufactured, and for all services rendered to date.

The guarantee letters and the letters of credit backing them had various expiration dates. But both provided for extension upon the request of their respective beneficiaries. And some of them were apparently extended as their expiration dates approached, so that they would remain valid until the completion of the work they guaranteed. The standby letters of credit stated that they were extendable on request and that, if the issuer was "unwilling to extend" a letter, it became immediately payable. *See, e.g.,* Record App. at 31.

d. *The circumstances of cancellation.* Itek's work proceeded uneventfully until Iran's government collapsed in early 1979. At that time Itek's performance was ahead of schedule, but it had not yet delivered any equipment to Iran. By February 1979, Itek had billed Iran for more than $20 million. It had received the original down payment of $4.5 million and additional payments of $6.6 million—a total of $11.1 million. Iran had consequently released the down payment guarantees to the point where there remained outstanding but one full down payment letter in the amount of $1.125 million and one partial down payment letter in the amount of $70,753.

The change of government in Iran, however, brought with it a deterioration in Iranian/American relations. In April 1979 the United States suspended Itek's export license. In May Itek notified Iran's new Ministry of National Defense about this "force majeure" problem, and, in accordance with the contract's terms, it called for consultations. These took place in Iran in August. Subsequently Itek applied for renewal of the suspended export license.

In November 1979 Iranians seized the United States Embassy in Teheran and took the Americans within it hostage. Given this fact, it is not surprising that, later that month, the United States refused to renew or to reissue the necessary export license. On December 6, 1979, Itek reported this fact to the Iranian Ministry and again invoked the contract's force majeure clause and requested consultations. No consultations took place. On February 18 and March 4, 1980, Melli cabled FNBB requesting extensions of the two remaining down-payment letters of credit, which, by their terms, expired in mid-April. On March 7, 1980 (three months after Itek had told the Ministry about the new United States refusal to grant export licenses), Itek cancelled the contract in accordance with the force majeure provisions. About

one week later (on March 13) FNBB told Melli that it would not extend the down-payment letters of credit, for the contract, along with the guarantees that the letters backed, had been terminated. Melli cabled back on March 16 stating that the Ministry had demanded payment of Melli's outstanding guarantee letters and that FNBB should therefore immediately pay to Melli the standby letters of credit then outstanding—the "good performance" letter for $2.25 million and the two down-payment letters for $1.125 million and $70,753 respectively. FNBB did not honor this demand, for by that time a temporary restraining order prohibited it from doing so.

e. *The court proceedings.* In January 1980, before Itek cancelled the contract, it brought this suit against FNBB seeking an order requiring FNBB to tell it if Melli tried to call the letters and then to delay for several days before paying. The district court granted this order on January 19. On March 11, after Itek cancelled the contract, it asked the court to enjoin FNBB from honoring any call on the letters. The court granted a temporary restraining order. Itek then joined Melli as a defendant. In April 1981, after hearings and fact finding, the court entered a preliminary injunction forbidding FNBB to pay Melli. It accompanied the injunction with extensive findings of fact and a published opinion. *Itek Corp. v. First National Bank of Boston,* 511 F.Supp. 1341 (D.Mass.1981). A year later, in May 1982, it made the injunction permanent. We had to vacate the permanent injunction, however, because of a change in Treasury Department regulations that had the effect of preventing American courts from entering *final* judgments in Iranian letter of credit cases. *Itek Corp. v. First National Bank of Boston,* 704 F.2d 1 (1st Cir.1983). The district court then reinstated its preliminary injunction; and Bank Melli now appeals that decision.

Melli raises two sets of arguments. First, it claims that Itek has not shown the "irreparable harm" requisite to the award of an injunction. Second, it claims that Itek has not shown the "fraud" here necessary to stop a beneficiary from calling a letter of credit. The record before us supports the district court's rejection of these arguments. *See Massachusetts Association of Older Americans v. Sharp,* 700 F.2d 749, 751–52 (1st Cir.1983); *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 823 (1st Cir.1979).

## II

### Irreparable Harm

Itek and Melli are fighting over money. To allow Melli to call the letters of credit will put the money in Melli's—and ultimately in the Iranian Ministry of Defense's—hands and require Itek to sue to recover it. Itek's harm is "irreparable" and warrants an injunction only if Itek has no adequate remedy at law to reclaim money in the Ministry's hands that rightfully belongs to Itek. *See Rockwell International Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 586 (2d Cir.1983); *Interco, Inc. v. First National Bank of Boston,* 560 F.2d 480, 484–85 (1st Cir.1977).

█ The contract provides a remedy at law. It provides that Itek can sue the Ministry to resolve disputes under the contract. But it stipulates that any such disputes shall be decided in Iran's courts applying the law of Iran. The recent history of relations between Iran and the United States indicates that this remedy is inadequate. Itek's efforts to recover money that Itek is legally owed through the Iranian courts would be futile. The district court found as much. Other courts have ruled similarly. *See, e.g., Rockwell International Systems, Inc. v. Citibank, N.A.,* 719 F.2d at 587–88; *Harris Corp. v. National Iranian Radio & Television,* 691 F.2d 1344, 1356–57 (11th Cir.1982). And Melli does not disagree.

The Iranian-American Hostage Agreements may have provided Itek with another remedy. An American firm can ask the Iran-United States Claims Tribunal (established under the Agreements) to adjudicate a dispute between it and Iran. This legal

remedy is presently inadequate, however, for Itek missed the filing deadline of January 1982. *See* Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, Art. III, ¶ 4, (Jan. 19, 1981), *reprinted in* Dep't St.Bull., Feb. 1981, at 3, 4. Thus, if the letter of credit money belongs to Itek but is given to Melli, Itek now seems without any adequate legal method to recover it.

Melli argues that the Claims Tribunal route—though now inadequate—formerly was adequate. Itek might have applied to the tribunal before January 1982. Itek should not, in Melli's view, obtain relief from a court of equity when Itek *itself* placed an alternative adequate remedy beyond its power to invoke. *See Commissioner v. Shapiro*, 424 U.S. 614, 634 n. 15, 96 S.Ct. 1062, 1074 n. 15, 47 L.Ed.2d 278 (1976); *Laino v. United States*, 633 F.2d 626, 629–30 (2d Cir.1980).

The fatal flaw in this argument, however, rests in the district court's finding that Itek was not unreasonable in failing to invoke the Claims Tribunal's jurisdiction before January 1982. Before that time Itek might reasonably have concluded that the Tribunal lacked jurisdiction. The Tribunal's mandate stated that it could not hear

> claims arising under a binding contract between the parties specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts . . . .

Declaration, *supra*, at Art. II, ¶ 1. The Itek-Ministry contract appears to fit within this jurisdictional bar. At the very least, this language rendered the availability of the Tribunal uncertain. And that uncertainty prevents the Tribunal from standing as an obstacle to injunctive relief. *See Rockwell International Systems, Inc. v. Citibank, N.A.*, 719 F.2d at 586–87; *cf. General Electric Co. v. Callahan*, 294 F.2d 60, 64 (1st Cir.1961) (availability of remedy at law must be "clear"), *cert. dismissed,*

369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962).

Melli replies that a Tribunal case, *Ford Aerospace & Communications Corp. v. Air Force of the Islamic Republic of Iran,* Case No. 159 (Iran-U.S. Claims Tribunal, Nov. 5, 1982), interprets the jurisdictional bar so narrowly that in fact the contract's "Iranian court" language would not have deprived the Tribunal of jurisdiction. This Tribunal case, however, was decided in November 1982, nearly ten months after the January 1982 filing deadline. The record supports the district court's conclusion that the November 1982 interpretation was far from obvious ten months earlier. *See Itek Corp. v. First National Bank of Boston,* 511 F.Supp. at 1349 n. 17; *see also Itek Corp. v. First National Bank of Boston,* 704 F.2d at 11 n. 9 (noting that Tribunal had appeared to lack jurisdiction, before *Ford Aerospace* decision). Thus, we accept its conclusion that the Tribunal remedy reasonably appeared inadequate before January 1982 and plainly was inadequate after January 1982. We need not consider the other problems Itek raises about the adequacy of a Tribunal remedy, for this jurisdictional problem alone sufficiently spoils this "alternative" legal route. There is sufficient risk that, without an injunction, Itek would be without means to recover its money from the Ministry to warrant a finding of "irreparable harm." That is to say, if Itek is otherwise entitled to the injunction, there is no "alternative legal remedy" that would bar a court from issuing the injunction.

## III

### *Fraud*

Massachusetts law, Mass.Gen.Laws ch. 106 § 5–114(2)(b), authorizes a court to enjoin payment on a letter of credit when it finds "fraud in the transaction." That Massachusetts Uniform Commercial Code provision states

> (2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required

document ... is forged or fraudulent or there is fraud in the transaction

(a) the issuer must honor the draft ... if honor is demanded by ... a holder in due course ...; and

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

The basic legal question in this case is whether the circumstances surrounding Melli's calls on FNBB's letters of credit establish "fraud in the transaction" within the meaning of this U.C.C. provision.

We answer this question fully aware of the need to interpret the "fraud" provision narrowly. The very object of a letter of credit is to provide a near foolproof method of placing money in its beneficiary's hands when he complies with the terms contained in the letter itself—when he presents, for example, a shipping document that the letter calls for or (as here) a simple written demand for payment. Parties to a contract may use a letter of credit in order to make certain that contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party. Thus, courts typically have asserted that such letters of credit are "independent" of the underlying contract. *See, e.g., Pringle-Associated Mortgage Corp. v. Southern National Bank*, 571 F.2d 871 (5th Cir.1978); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir.1970); *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316, 323–24 (1975); *see also* U.C.C. § 5–114(1); Note, *"Fraud in the Transaction:" Enjoining Letters of Credit During the Iranian Revolution*, 93 Harv.L.Rev. 992, 1001 (1980). And they have recognized that examining the rights and wrongs of a contract dispute to determine whether a letter of credit should be paid risks depriving its beneficiary of the very advantage for which he bargained, namely that the dis-

pute would be resolved while he is in possession of the money. *See, e.g., KMW International v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 15–17 (2d Cir.1979); Note, *"Fraud in the Transaction"*, *supra*, at 1008–09; Note, *Letters of Credit: Injunction as a Remedy for Fraud in U.C.C. Section 5–114*, 63 Minn.L.Rev. 487, 489–90 (1979).

Despite these reasons for hesitating to enjoin payment of a letter of credit, the need for an exception is apparent. Suppose the document for which a letter calls has been forged. Or suppose that the beneficiary has knowingly failed to comply with an important term contained in the underlying contract—a term that the parties intended as a precondition for the beneficiary's exercise of his right to call the letter. Courts have not hesitated to examine the documents that the letter calls for to see if they show fraud. *See, e.g., Harris Corp. v. National Iranian Radio & Television*, 691 F.2d at 1355–56; *Shaffer v. Brooklyn Park Garden Apartments*, 311 Minn. 452, 250 N.W.2d 172, 180–81 (1977); *cf. Banco Espanol de Credito v. State Street Bank & Trust Co.*, 409 F.2d 711 (1st Cir.1969). And courts have also enjoined payment where there was relevant fraud in the underlying transaction. Thus, in a leading case, a seller, contractually committed to ship bristles to a buyer, shipped rubbish instead. The court refused to allow the seller to call the letter, put the money in his pocket, and let the buyer sue him, for in the court's view, the seller did not even have a colorable claim that he had done what the contract called for as a precondition to obtaining the money, namely, ship the bristles. *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941).

The Uniform Commercial Code provision here at issue embodies this "fraud" exception. The exception recognizes the unfairness of allowing a beneficiary to call a letter of credit under circumstances where the underlying contract plainly shows that he is not to do so. *See, e.g., Dynamics Corp. of America v. Citizens & Southern*

*National Bank*, 356 F.Supp. 991 (N.D.Ga. 1973); *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 360 N.E.2d 943, 392 N.Y.S.2d 265 (1976); *O'Grady v. First Union National Bank*, 296 N.C. 212, 250 S.E.2d 587, 598–602 (1978). Yet, it also recognizes the need for courts to tread with care lest they deprive the letter's beneficiary of the very benefit for which he bargained. Thus, courts have stated that the "fraud in the transaction" exception is available only where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Roman Ceramics Corp. v. Peoples National Bank*, 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir. 1983) (quoting *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. at 359, 336 A.2d at 324–25 (1975)); *see also* Comment, *Enjoining the International Standby Letter of Credit: The Iranian Letter of Credit Cases*, 21 Harv.Intl.L.J. 189, 241–43 (1980) (focus should be on parties' original allocation of risks and responsibilities).

In applying these principles to this case, we assume that Melli presented to FNBB the simple document (a written request asserting that the Ministry had required Melli to pay the associated guarantee letters) that the letters called for. We also assume that at least one purpose of the parties in arranging for the letters was to give the Ministry control of the money during the pendency of underlying contractual disputes. We take as a given that the parties intended the contract's express terms concerning the guarantees to govern the Ministry's right to call the letters from Melli to the Ministry. (The parties do not dispute this point.) And we take as given that these same contract terms limit the rights of Melli to call the FNBB letters; Melli could only legitimately call the FNBB letters if the Ministry had legitimately called the Melli guarantees. (The parties do not dispute this point either, perhaps because, as the district court found, *see* 511 F.Supp. at 1350–51, Melli and the Ministry are both part of, or owned by, Iran's government, and they were equally aware of the rele-

vant events. *See Touche Ross & Co. v. Manufacturers Hanover Trust Co.*, 107 Misc.2d 438, 434 N.Y.S.2d 575 (Sup.Ct. 1980), *aff'd mem.*, 86 App.Div.2d 990, 449 N.Y.S.2d 125 (1982).) We conclude that the issue before us is whether, given the terms of the contract, the Ministry and in turn Melli have a colorable right to call the "guarantees," or whether Itek has successfully shown that, in light of the contractual terms governing the guarantees, the beneficiaries' demands for payment have "absolutely no basis in fact." *See Dynamics Corp. of America v. Citizen's & Southern Bank*, 356 F.Supp. at 999; *see also Harris Corp. v. National Iranian Radio & Television*, *supra*; *United Technologies Corp. v. Citibank, N.A.*, 469 F.Supp. 473 (S.D.N.Y. 1979). If Melli has no plausible or colorable basis under the contract to call for payment of the letters, its effort to obtain the money is fraudulent and payment can be enjoined. The district court found that Itek had met this standard and shown fraud. Opinion of June 28, 1983, at 17–18 (finding likelihood of success); Opinion of May 25, 1982, at 9–10 (finding success on merits). We agree.

### A

### *The "Good Performance" Letter*

■ Melli called the "good performance" letter of credit on March 16, 1980. As the district court found, this call was fraudulent for the following reasons: By March 16, 1980, Itek had cancelled the contract on the basis of its force majeure provisions. Melli knew that Itek had done so. And the contract specifically states that, upon force majeure cancellation of the contract, "all Bank Guarantees of good performance of work will be immediately released." Contract ¶ 9.4.

Moreover, Itek followed the contract-specified cancellation procedures. It notified the Ministry about the export license suspension in May 1979. It consulted with the Ministry. It again notified the Ministry on December 6, 1979. It offered to consult again. It waited three months. It then

told the Ministry that it was cancelling the contract. It completed this contract-specified procedure by March 7, 1980. Melli suggests that it would be unfair for Itek to keep both the goods it was manufacturing and all the payments it had received. But the parties expressly agreed that, upon cancellation of the contract because of force majeure, Itek would be entitled to compensation for its work done to date, regardless of non-delivery of the goods, and that Iran would not have recourse to the good performance guarantee. Contract ¶¶ 8.6, 9.4.

Melli's strongest argument on appeal is that the December 1979 circumstances did not constitute "force majeure" within the terms of the contract. Melli says that the force majeure provision (insofar as it permits cancellation) applies only when the circumstances will prevent performance *permanently*. Melli adds that the United States *suspended* the export license; it *failed to renew* the export license; but it did not say it *"cancelled"* it. Hence, Melli concludes, Itek invoked the cancellation provision improperly.

We agree that the contract uses the word "cancel." It extends the force majeure contract-cancellation right to the situation in which the "U.S. government cancel[s] the export licence [sic]." Contract ¶ 8.7. The record reveals that the United States previously permitted export of this high-technology optical equipment for use by the Iranian military; the Iranian revolution intervened; the United States government withdrew its permission; and the record reveals nothing that makes renewal or reissuance of the license probable. These facts show cancellation.

Insofar as Melli argues that "cancellation" in the contract refers to "permanent cancellation"—that is to say, cancellation as to which there is no *logical* possibility of a change of mind—the contract belies the claim. Paragraph 8.6 requires the party giving notice of force majeure to "mention in his letter the estimated duration of time during which these circumstances will continue." The parties are apparently to take

duration into account when they discuss the force majeure problem, a fact that shows "logically permanent" force majeure was not a requirement. Insofar as Melli is making a purely linguistic point, namely that the contract requires the United States to use the word "cancel" in respect to the export licenses, the short and conclusive answer is that the contract refers to what the United States *does*, not to the precise words that it uses when it does it.

We note that the contract provides that three months after force majeure notification, either party can cancel the contract if, "on his opinion," the parties have found no acceptable solution. Whatever Melli's rights to call the letters during the three month discussion period, we conclude that by mid-March 1980—when that period had passed, Itek "on his opinion" had decided no acceptable solution to the force majeure problem had been reached, and Itek had notified Melli of cancellation—the contract plainly barred a call on the "good performance" letters.

Other courts, dealing with similar facts, have reached similar conclusions. In *Touche Ross & Co. v. Manufacturers Hanover Trust Co., supra*, Touche Ross invoked a force majeure provision in its contract with Iran's Ministry of War to cancel the contract unilaterally after the Iranian Revolution. Several weeks after the cancellation, the Iranian bank that had provided the guarantee letter required by the contract notified Manufacturers Hanover, the issuer of the standby letter of credit backing the guarantee, that the Ministry had called the guarantee and that payment was due under the letter of credit. The court held that, since the contract provided for release of all bank guarantees upon cancellation of the contract due to force majeure, "no legitimate call could be made on the guaranty or the letter of credit." 434 N.Y.S.2d at 577. And since all Iranian financial institutions had been nationalized during the Revolution, the Iranian bank "could not have legitimately paid on the guaranty, as [the bank] would be simply paying itself. Therefore, any call on the

letter of credit would be fraudulent." *Id.* at 578. *See also Rockwell International Systems, Inc. v. Citibank, N.A.,* 719 F.2d at 585 n. 2 (If Rockwell had exercised its right to cancel the contract by declaring force majeure, "the bank guarantees would have been released, and no legitimate call could have been made under the letters of credit."). For similar reasons, we have concluded that the call on the "good performance" letter was fraudulent, and its payment can be enjoined.

## B

### The "Down Payment" Letters

We also agree with the district court's conclusion that Melli had no plausible legal basis for calling the "down payment" letters of credit. The contract says that the down payment guarantees are to be released "within 4 weeks after the clearance of down-payments amount." Contract ¶ 9.5. To understand the meaning of "clearance" one must refer to Appendix 3 of the Contract, which provides that the first sixty percent of the contract amount ($13.5 million) would be paid against monthly invoices approved by the Ministry "after deduction of the amount of the related down payment." ¶ 1.1. The Appendix adds that the twenty percent down payment ($4.5 million) "will be gradually deducted from [Itek's] invoices." ¶ 1.4. In other words, as Itek billed the Ministry for the first $13.5 million of the work performed, the Ministry (which had already given Itek a $4.5 million down payment) would pay two-thirds of each bill and charge the remaining third against a portion of the down payment. At the same time, the Ministry presumably would release the "down payment" letters of credit to the extent they gave the Ministry the right to call back *that* "cleared" portion of down payment.

Thus, until the beginning of 1979 (when Iran stopped paying any of Itek's bills), Itek had received $11.1 million including the $4.5 million down payment, while the Ministry had released all but $1.2 million of the down payment guarantees. These

numbers suggest that the $11.1 million included $9.9 million of invoiced payments; the $9.9 million represents seventy-three percent of the first sixty percent of the contract amount; the $3.2 million in down payment guarantees released represents seventy-three percent of the total down payment. The "down payments amount" then "cleared" gradually as invoices representing up to sixty percent of the contract price were presented for payment; by the time sixty percent of the work was complete and invoiced, the entire "down payments amount" would have "cleared"; and four weeks thereafter all down payment guarantees were to have been released. This is precisely what Itek says occurred.

Itek continued to incur expenses and send invoices to Iran after the Ministry had stopped paying its bills. Several times in 1979 Itek summarized the outstanding invoices and brought the matter to the Ministry's attention. The Ministry did not object to the invoices; it did not dispute either fact or law or provide an excuse for not paying; but it did not pay them. The invoices soon carried Itek's total invoice amount well beyond the sixty percent limit.

■ The facts that Itek presented invoices amounting to more than sixty percent of the contract price; that the Ministry did not object to the invoices; that four weeks (the time the contract allotted for payment or objection by the Ministry) passed without Ministry objection; that an additional four weeks passed after which the contract called for release of the down payment guarantees; seem to amount to the occurrence of conditions requiring release of the down payment guarantees. To argue the contrary would require arguing a different meaning of the word "clearance." Melli has not done so; nor has it given us any reason to believe the parties intended a different meaning. Thus, the guarantees were to have been released well before they were called.

Melli may note, however, that Itek has argued this case on a "release date" assumption more favorable to Melli. It has

assumed that the down payment guarantees remained in effect until March 7, 1980, when it sent the Ministry a telex—the telex we have discussed in Part III A above—that demanded their release. This assumption may stem from a belief that the force majeure provisions govern the "down payment," as well as the "good performance," guarantees; or it may stem from a belief that the letters simply stay in effect until release is expressly requested. In neither case does the "March 7 release date" assumption change the result, although it does permit Melli to make an ingenious argument.

The ingenious argument is the following: Melli telexed FNBB on February 18 and March 4 asking for extensions of the two outstanding down payment letters (which by their own terms would have expired in mid-April). The letters themselves state that, if a request for extension is denied, the letters of credit are to be treated as having been called:

> The validity of this letter of credit will be extended for the period requested by you [Melli] if, prior to the expiration date of this letter of credit, you notify us [FNBB] by tested cable of the period of extension requested. If this bank is unwilling to extend the validity of this letter of credit, then this bank will be committed to remit the amount of this letter of credit without further demand on the part of Bank Melli, Iran.

Record App. at 31. Melli claims that, by virtue of these extension requests that FNBB declined to honor, the letters were called prior to Itek's March 7 cable which Itek says had the effect of terminating them.

We do not believe that this argument—based on Itek's assumption—helps Melli for two reasons. First, since the down payment amounts had previously "cleared," Melli had no contractually valid basis for asking for an extension. If a beneficiary of a letter of credit knows that all the obligations the letter was to secure have been performed, his call on the letter is fraudulent. *See Roman Ceramics Corp. v. Peoples National Bank, supra; Harris Corp. v. National Iranian Radio*

*& Television, supra.* Here the beneficiary, aware of the invoice amounts, the lack of objection to the invoices' validity, and the contract's terms calling for release, would have to know it had no basis for seeking an extension or for calling the letter. If there is some special factual circumstance suggesting the contrary, the record does not reveal it.

Second, the contract does not say that the letter of credit is called when its beneficiary "requests extension;" it says it is due when the issuer is "unwilling to extend." FNBB did not decline extension until March 13, by which time Itek had sent the March 7 telex making clear its view that Melli had no legal basis for calling or extending the letters. Nothing in the record suggests that FNBB was "unwilling" to extend prior to March 7 or that the March 13 decision was unreasonably delayed; the "expiration dates" written into the letters were still over a month away.

For these reasons, we find adequate support for the district court's conclusions that Melli was without a plausible legal basis for calling the letters of credit and that its call upon them, in the circumstances revealed in this record, constituted "fraud." The injunction therefore properly issued. And the district court's order is

*Affirmed.*