818 So.2d 1057 (2002)
NEW ORLEANS BRASS, L.L.C.
v.
WHITNEY NATIONAL BANK and the Louisiana Stadium and Exposition District.
No. 2001-CA-2308.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 2002.
*1058 Jane Ettinger Booth, Booth & Booth, New Orleans, LA, for Plaintiff/Appellant.
Jack M. Capella, Capella Law Firm, Metairie, LA, for Defendant/Appellee.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge MIRIAM G. WALTZER, Judge MICHAEL E. KIRBY).
KIRBY, Judge.
In this case the New Orleans Brass, L.L.C. ("Brass"), applied for an irrevocable standby letter of credit with the Whitney Bank. The Whitney Bank issued the letter of credit in favor of the Louisiana Stadium and Exposition District ("LSED") as a guarantee for rental payments. A dispute arose about the rental payments and LSED presented documents for honor on the letter of credit. The Brass sought an injunction from the trial court to prevent the honoring of the letter of credit, which was denied. On appeal the Brass alleges fraud under La. R.S. 10:5-109, seeks the return of the payment on the standby letter of credit and a permanent injunction. We affirm the trial court, noting the independence of letters of credit from the underlying transaction and the lack of "material fraud" as defined in La. R.S. 10:5-109.

STATEMENT OF FACTS
The New Orleans Brass, L.L.C., owns an East Coast Hockey League team that plays its games in the New Orleans Arena. *1059 Pursuant to a provision in its lease with the arena, the Brass, ("applicant"[1]), applied to and had the Whitney National Bank (the "issuer") issue an Irrevocable Transferable Standby Letter of Credit No. SB36099 against one of its accounts in favor of the LSED ("beneficiary") in the amount of U.S. $300,000.00 (Three Hundred Thousand and NO/ 100 U.S. Dollars) as a guarantee for rent. The standby letter of credit requires the presentation of two documents as a condition for payment:

Document 2. A notarized statement purportedly signed by an authorized representative of the Beneficiary reading:
"We hereby certify that the New Orleans Brass, L.L.C. is in default of Section 4(a) of the Arena Lease Agreement between the Beneficiary, the State of Louisiana, and the New Orleans Brass, L.L.C."
"We hereby further certify that we have notified the Tenant that they are in default in accordance with Section 21(a) of the Arena Lease Agreement and the amount drawn hereunder is payable pursuant to Section 4(g) of the Arena Lease Agreement."
* * * *
Document 3. A notarized statement purportedly signed by an authorized representative of the Louisiana Stadium and Exposition District reading:
"We hereby certify that the Contract administrator of the LSED has certified that on or before October 29, 1999 improvements to the Arena (including but not limited to a properly functioning ice surface, 17,500 unobstructed seats, functioning lighting, sound and scoreboard, and locker, training and coaching rooms) were sufficiently completed for the presentation of a game of professional ice hockey."
These drafts were to be presented on or prior to the expiry date[2] of the irrevocable standby letter of credit, which was September 29, 2001.[3]
The Brass failed to pay the rent for the 2000-2001 season in a timely manner and in accordance with the lease agreement (which calls for three equal payments in December, 2000, March, 2001, and June 2001). The LSED, through its contract manager for public facilities, i.e. SMG, put the Brass in default.
In response to the notice of default, the Brass advised that they believed SMG's calculation for outstanding rent was off by approximately $33,000. SMG responded that they believed that the calculation for outstanding rent was correct. The Brass never offered to pay the $183,406, the amount that the Brass believed it owed.
In an attempt to collect the rent owed, Mark Delesdernier, Jr. presented documents for honor under the standby letter of credit to the Whitney Bank, requesting that it honor the letter of credit in the amount of U.S. $216,527.00, the amount the LSED claims it was owed in rent.
Shortly thereafter, the Brass filed for a temporary restraining order, preliminary and/or permanent injunction against Whitney and the LSED. The Brass' petition for this injunction did not allege that the documentation submitted by the LSED was *1060 non-conforming or that it was forged, but rather that the documents submitted contained false representations, and drawing on the letter of credit would cause irreparable injury.
Based upon the petition, the Honorable Lloyd Medley issued a temporary restraining order prohibiting Whitney National Bank from releasing any funds whatsoever to SMG or the LSED pursuant to the standby letter of credit.
On September 13, 2001, a preliminary injunction hearing was held before the Honorable Robin Giarrusso with supporting affidavits and oral arguments by all parties.
On September 17, 2001, Judge Giarrusso rendered Judgment which dissolved the temporary restraining order and denied the preliminary injunction. The Court found "no fraudulent representation made by the [LSED] in its certification to the Whitney Bank." The Brass then attempted to present a Motion and Order for Suspensive Appeal, and given Judge Giarrusso's absence, they went before the duty judge, Judge Michael Bagneris. Judge Bagneris, not knowing the entirety of the Judgment, entered the order for a suspensive appeal and ordered that the bond remain the same. Upon Judge Giarrusso's discovery of the ordering of the suspensive appeal, she vacated that judgment and ordered a devolutive appeal. She correctly noted that the granting of a suspensive appeal would have the effect of a temporary injunction.
Thereafter, the Whitney Bank honored the presentation of documents made by LSED and paid the amount sought.

STATEMENT OF THE LAW
The standard of review for the trial court's finding of fact that material fraud as found in La. R.S. 10:5-109 did not exist is that of manifest error.
The law of letters of credit developed from decade-long efforts to simplify and harmonize procedures surrounding commercial practices. The goal was to identify and articulate practices, and to develop formulae and forms that reflected these practices. The central theme of the practice of letters of credit is the principle that the letter of credit be independent from the underlying commercial contract.[4]
In a letter of credit there are no less than three parties: an applicant (e.g. a buyer or lessee, etc.), an issuer (e.g. bank), and a beneficiary (e.g. a seller or lessor, etc.).[5] The independence principle states that the underlying contract, e.g. a sales or lease contract, between the applicant and the beneficiary, will be viewed as distinct from an overarching contract, i.e. the letter of credit, which is between the applicant's bank[6] and the beneficiary. Thereby creating two distinct contracts. First National Bank of Jefferson Parish v. Carmouche, 515 So.2d 785 (La.1987).
In essence, letters of credit place the documentation representing the goods[7] and money in an uninterested third-party's hands. The laws governing letters of credit have always followed from the customary banking practices and uses. *1061 Because the commercial instrument exists to promote and encourage business deals, a practice-oriented approach should be taken in their interpretation. Accusations of minor inconsistencies or unimportant discrepancies in the presentation of documents, which bank practitioners normally overlook, are not sufficient to defeat a properly conforming request. Voest-Alpine Trading USA Corp. v. Bank of China, 288 F.3d 262 (5th Cir.2002).
This case revolves around whether the allegations of fraud in the underlying contract were so "material" as to meet the requirements of La. R.S. 10:5-109(a). If not, then the trial court was correct in denying an injunction. Thus, only if the misrepresentations amounted to "material fraud", would the issuance of an injunction be justified on this commercial instrument La. R.S. 10:5-109(b). Without the presence of material fraud, the issuer has a legal obligation to honor documents presented that conformed with the letter of credit. La. R.S. 10:5-108.[8]
Louisiana R.S. 10:5-109 treats the topic of fraud and forgery in letters of credit. The relevant parts state:
(a) If a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or materially fraudulent, or honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant:
* * *
(2) the issuer, acting in good faith, may honor or dishonor the presentation....
(b) If an applicant claims that a required document is forged or materially fraudulent or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant, a court of competent jurisdiction may temporarily or permanently enjoin the issuer from honoring a presentation or grant similar relief against the issuer or other persons only if the court finds that:
(1) the relief is not prohibited under the law applicable to an accepted draft or deferred obligation incurred by the issuer;
(2) a beneficiary, issuer, or nominated person who may be adversely affected is adequately protected against loss that it may suffer because the relief is granted;
(3) all of the conditions to entitle a person to the relief under the law of this state have been met; and
(4) on the basis of the information submitted to the court, the applicant is more likely than not to succeed under its claim of forgery or material fraud and the person demanding honor does not qualify for protection under Subsection (a)(1).
La. R.S. 10:5-109 [Emphasis added.]
The court in Itek Corp. v. First National Bank of Boston, 730 F.2d 19, 24 (1st Cir. 1984), offers guidance on interpreting the fraud provision, La. R.S. 10:5-109(a), stating:
... [There is a] need to interpret the "fraud" provision narrowly. The very object of a letter of credit is to provide a near foolproof method of placing money in its beneficiary's hands when he complies with the terms contained in the letter itselfwhen he presents, for example, a shipping document that the letter calls for or (as here) a simple *1062 written demand for payment. Parties to a contract may use a letter of credit in order to make certain that contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party. Thus, courts typically have asserted that such letters of credit are "independent" of the underlying contract. See, e.g., Pringle-Associated Mortgage Corp. v. Southern National Bank, 571 F.2d 871 (5th Cir.1978); Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461, 464-65 (2d Cir. 1970); Intraworld Industries, Inc. v. Girard Trust Bank, 461 Pa. 343, 336 A.2d 316, 323-24 (1975).
The first comment to La. R.S. 10:5-109(b) guides us on when an injunction should issue in the case of a letter of credit. It summarizes by citing the following from Ground Air Transfer, Inc. v. Westates Airlines, Inc., 899 F.2d 1269, 1272-73 (1st Cir.1990):
We have said throughout that courts may not "normally" issue an injunction because of an important exception to the general "no injunction" rule. The exception, as we also explained in Itek, 730 F.2d at 24-25, concerns "fraud" so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances "plainly" show that the underlying contract forbids the beneficiary to call a letter of credit, Itek, 730 F.2d at 24; where they show that the contract deprives the beneficiary of even a "colorable" right to do so, id., at 25; where the contract and circumstances reveal that the beneficiary's demand for payment has "absolutely no basis in fact," id.; see Dynamics Corp. of America, 356 F.Supp. at 999; where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served," Itek, 730 F.2d at 25 (quoting Roman Ceramics Corp. v. Peoples National Bank, 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir.1983) (quoting Intraworld Indus., 336 A.2d at 324-25)); then a court may enjoin payment.
In this case the Brass, who is the applicant/plaintiff, alleged misrepresentations and fraud, and argued that an injunction should be issued. The trial court determined that no fraudulent representation was made to Whitney and found that any suspension of payment would defeat the purpose of a standby letter of credit, which is to assure prompt payment.[9]
To support their argument for an injunction the Brass submitted affidavits of C. Ray Nagin, President and Managing Member of New Orleans Brass, L.L.C. and David White, Member and Chief Financial Officer for the New Orleans Brass, L.L.C. These affidavits called into dispute the calculation of the rent and whether or not the arena was sufficiently completed. Specifically called into question is whether or not the Brass were given credit for $8,350 remaining in suite deposits, $22,271 in unpaid seasonal tickets sales for suite holders, and the approximate sum of $2,500 in settlement for the final ice show. These sums were not deducted from the $216,527 which was drawn upon pursuant to the standby letter of credit. The ability of the Brass to prevail on such claims is not to be determined in these proceedings to enjoin the payment on a letter of credit. These claims if valid should be brought in an action for breach of contract against LSED, which is to be viewed as a separate *1063 contract from the letter of credit contract between Whitney and LSED.
The Brass argues that the arena may have been short a few of the 16,968 unobstructed seats. Even assuming this to be the case, nowhere is there an accusation of a material deficiency of seats. The record reveals that seats were not a problem in the presentation of the Brass's hockey season. Therefore, the alleged deficiency of seats would not amount to material fraud, that would cause us to issue an injunction or order the return of the monies paid.
The Brass submitted affidavits by Dan Belisle and Walter Baudier, members of the Brass Management, and Kerry Decay that stated that the showers, sauna, laundry and Jacuzzi in the locker room were not finished, as well as lack of lighting in the offices. These facts caused the Brass to transport their equipment daily from the Municipal Auditorium. Nonetheless, this did not prevent the ice hockey games from being played and the Brass' use of the arena. We find, as the trial court did, that lacking a Jacuzzi, sauna and showers, as well as having some offices that were not complete does not constitute fraud so serious as to make it obviously pointless and unjust to permit the LSED to obtain the rent for use of the arena via collecting on the letter of credit. See Itek Corp., supra, at 24.
The Brass also submitted affidavits by Johnny P. Odom, the Chief Building Inspector for the City of New Orleans, and George A. Hero, IV, that called into question the safety of the arena. Specifically we found in the record that there are problems with the smoke detectors at "Waffle Slab" and the suite level concourse lacks fire alarm notification speakers. Nevertheless, the Louisiana Department of Public Safety and Corrections Office of State Fire Marshall granted a Temporary Use and Occupancy Certificate to the arena provided that certain conditions were met.
While the alleged unfinished state of the offices, the lack of Jacuzzi, sauna, laundry and showers, as well as the disputes over the amount of rent owed and the building permits may be classified as breaches of contract, they cannot be the basis for an injunction issued on a standby letter of credit and a finding of material fraud, which would make us order the rent collected to be returned.
The Brass' argument as concerns the underlying contract, i.e. to collect rent on an arena where an entire season of ice hockey was played constitutes material fraud, has no merit. None of the four categories of material fraud cited above from Ground Air Transfer, Inc., apply here, thus an injunction cannot be issued.
Moreover, assuming the LSED has not in fact fulfilled every aspect of the underlying lease agreement, what is stated in the documents presented for the letter of credit by Mark Delesdernier, Jr. and Gregory A. Davis, Sr. does not reach the status of "material fraud." In this case, the documents were not forged, and we find the exception of "material fraud" in the underlying contract does not apply because the arena was functional and hosted an entire season of ice hockey. Thus, we need not analyze La. R.S. 10:5-109(b), which deals with when an injunction should issue, because we find no material fraud as defined in La. R.S. 10:5-109(a). Therefore, the trial court was correct in denying the permanent injunction.
Because we find the trial court was correct in finding no material fraud, we need not reach the issue of whether Judge Giarrusso's order, which vacated the duty Judge's order, was improper.
AFFIRMED.

*1064 APPENDIX

La. R.S. 10:5-108
(a) Except as otherwise provided in R.S. 10:5-109, an issuer shall honor a presentation that, as determined by the standard practice referred to in Subsection (e), appears on its face strictly to comply with the terms and conditions of the letter of credit. Except as otherwise provided in R.S. 10:5-113 and unless otherwise agreed with the applicant, an issuer shall dishonor a presentation that does not appear so to comply.
(b) An issuer has a reasonable time after presentation, of at least three days, but not beyond the end of the seventh business day of the issuer after the day of its receipt of documents:
(1) to honor,
(2) if the letter of credit provides for honor to be completed more than seven business days after presentation, to accept a draft or incur a deferred obligation, or
(3) to give notice to the presenter of discrepancies in the presentation.
(c) Except as otherwise provided in Subsection (d), an issuer is precluded from asserting as a basis for dishonor any discrepancy if timely notice is not given, or any discrepancy not stated in the notice if timely notice is given.
(d) Failure to give the notice specified in Subsection (b) or to mention fraud, forgery, or expiration in the notice does not preclude the issuer from asserting as a basis for dishonor fraud or forgery as described in R.S. 10:5-109(a) or expiration of the letter of credit before presentation.
(e) An issuer shall observe standard practice of financial institutions that regularly issue letters of credit. Determination of the issuer's observance of the standard practice is a matter of interpretation for the court. The court shall offer the parties a reasonable opportunity to present evidence of the standard practice.
(f) An issuer is not responsible for:
(1) the performance or nonperformance of the underlying contract, arrangement, or transaction,
(2) an act or omission of others, or
(3) observance or knowledge of the usage of a particular trade other than the standard practice referred to in Subsection (e).
* * *
NOTES
[1] The term "applicant" is a term of art within the field of letters of credit, it refers to the party who applies for a letter of credit to be issued from a bank in favor of a beneficiary. For further discussion see the Statement of the Law which follows.
[2] The date on which a letter of credit expires.
[3] The expiry date was included in an amendment to the letter of credit, as well as an amendment that lowered the requirement of the number of unobstructed seats to 16,968.
[4] The 2002 Annual Survey of Letter of Credit Law & Practice, (James E. Byrne ed., Institute of International Banking Law & Practice, 2002). See also, www.iiblp.org.
[5] There can be more than three parties, e.g. in the case of corresponding or advising banks.
[6] The applicant's bank issues the letter of credit in favor of the beneficiary.
[7] An example of such documentation would be bills of lading, or in this case affidavits concerning the arena.
[8] For relevant parts of the statute, see the appendix.
[9] The roots of the development of this concept in Louisiana case law is found in Cromwell v. Commerce & Energy Bank, 464 So.2d 721 (La.1985).